UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION (at Frankfort)

LUCY ALEXANDER,
MARY BAUGHMAN,
ROBERT MOODY,
DANNY METTS,
and RANDALL ROACH

On behalf of themselves and all
those similarly situated

    Plaintiffs,

v.

THOMAS B. MILLER, in his official
capacity as Commissioner of the
Kentucky Department of Revenue;

TAMMY WATTS, in her official
capacity as Executive Director of the
Kentucky Department of Revenue's
Office of Processing and
Enforcement

ELI CAPILOUTO, in his official
capacity as President of the
University of Kentucky

and

PENNY COX, in her official capacity
as Acting Treasurer of the
University of Kentucky

    Defendants.

Civil Action No.
_____

**CLASS ACTION
COMPLAINT**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

# Introduction

1. The Fourteenth Amendment of the United States Constitution prevents states from taking people's property without first giving them due process—notice and an opportunity to be heard.

2. However, Kentucky's Department of Revenue ("DOR") collects millions of dollars per year—recovering the highest fees and interest rates in the nation—on behalf of the University of Kentucky's healthcare system ("UK Healthcare"), while completely disregarding the Fourteenth Amendment's protections.

3. UK Healthcare's bills and communications to patients do not inform patients that they have the right to appeal the existence or amount of their debt. Indeed, to the extent UK Healthcare in fact offers an appeal process, UK Healthcare's communications actively conceal from patients that such a process even exists.

4. When patients have billing disputes, rather than offering a process to resolve those disputes, UK Healthcare simply refers the bills to the DOR for collection. UK Healthcare does not notify patients prior to making this referral. Worse, making the referral cuts off the patient's ability to apply for Financial Assistance, an entitlement program offered by UK Healthcare designed to relieve low-income, uninsured and underinsured patients of their medical debts.

5. The DOR likewise provides patients no opportunity to dispute the existence or amount of their debt. Rather, when patients raise disputes with the DOR, the DOR responds that it is "too late" to have a hearing.

6. The DOR garnishes patients' wages (sometimes entire paychecks), zeroes out their bank account, offsets their state tax refunds, and places liens on their homes, all

without providing any opportunity to challenge the existence and amount of the alleged debt.

7. The DOR coerces people to enter into "voluntary" payment agreements by making false threats to levy their Social Security funds, seize their personal property, and publish their names on a list of delinquent debtors if they do not pay. Such deception if undertaken by a private debt collector would plainly violate the Fair Debt Collection Practices Act.

8. UK Healthcare patients face a choice that is really no choice at all: they can pay whatever the DOR demands regardless of the debt's validity or the DOR will devastate their finances.

9. In short, at no point do patients receive sufficient notice or an opportunity to be heard on the validity or amount of the underlying debt or the manner of collection. The entire process—from billing by UK Healthcare through to DOR's garnishing wages, offsetting state tax refunds, levying bank accounts, and placing liens on real estate—is a pervasive, ongoing violation of the Due Process Clause of the Fourteenth Amendment.

## Parties

10. Named Plaintiff Lucy Alexander is an adult individual who resides in and is domiciled in Simpsonville, Shelby County, Kentucky.

11. Named Plaintiff Mary Baughman is an adult individual who resides in and is domiciled in Lexington, Fayette County, Kentucky.

12. Named Plaintiff Robert Moody is an adult individual who resides in and is domiciled in Wilmore, Jessamine County, Kentucky.

13. Named Plaintiff Danny Metts is an adult individual who resides in and is domiciled in Nicholasville, Jessamine County, Kentucky.

14. Named Plaintiff Randall Roach is an adult individual who resides in and is domiciled in Bimble, Knox County, Kentucky.

15. Defendant Thomas B. Miller, Commissioner of the Kentucky Department of Revenue (DOR), is sued in his official capacity. As head of the DOR, Mr. Miller is responsible for the DOR's collection practices, including the practices challenged by the Plaintiffs in this suit — namely collection of UK Healthcare debts, fees, and interest without due process.

16. Defendant Tammy Watts, Executive Director of the DOR's Office of Processing and Enforcement, is sued in her official capacity. As the head of the DOR's Office of Processing and Enforcement, Ms. Watts is ultimately responsible for the DOR's collection practices, including the practices challenged by the Plaintiffs in this suit — namely collection of UK Healthcare debts, fees, and interest without due process. On entry of an appropriate stipulation to ensure the availability of binding relief, Plaintiffs will drop one of Defendants Miller and Watts and/or substitute some other DOR official in his/her official capacity.

17. Defendant Penny Cox, Acting Treasurer of the University of Kentucky, is sued in her official capacity. In her position she is responsible for and has direction of the billing and collection practices of UK Healthcare.

18. Defendant Eli Capilouto is the President of the University of Kentucky and is sued in his official capacity. As President, he is responsible for the management of the University of Kentucky's operations, both academic and fiscal, and thus has the ultimate power and responsibility to direct the operations complained of herein. On

entry of an appropriate stipulation to ensure the availability of binding relief, Plaintiffs will drop one of Defendants Cox and Capilouto and/or substitute some other University or UK Healthcare official in his/her official capacity.

19. Each individual defendant is sued in his or her official capacity only for declaratory and injunctive relief. Damages are not at issue.

## Jurisdiction and Venue

20. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4).

21. Venue lies within this District pursuant to 28 U.S.C. § 1391(b).

## Statutory and Regulatory Scheme

22. UK Healthcare and the Kentucky Department of Revenue (DOR) have given various explanations at various times of the statutory and regulatory basis on which DOR claims the right to collect debts on behalf of UK Healthcare.

23. In a recent case before the Kentucky Supreme Court, UK Healthcare and the DOR claimed that UK Healthcare refers its medical debts to the DOR for collection based on K.R.S. § 131.130(11) and K.R.S. §§ 45.237, 45.238. See Appellant Univ. of Ky. Brief in Univ. of Ky. v. Moore, 2018-SC-000193, pp. 16-17. See also Appellant Dep't of Revenue Brief in Univ. of Ky. v. Moore, 2018-SC-000193, pp. 1-2.

24. K.R.S. § 45.238(1) states that, "[d]ebts that are certified by an agency … as provided in K.R.S. § 45.237 shall be referred to the department of collection. The department shall be vested with all the powers necessary to collect any referred debts."

25. K.R.S. § 45.237 does not define "certified debt." It merely defines "debt" as "[f]or agencies, a sum certain which has been certified as due and owing[.]" K.R.S. § 45.237(1)(d)(1).

26. In fact, collection of state agency debts under § 45.238 is authorized *only* for debts "certified" under § 45.237, and the *only* debts eligible for certification under § 45.237 are claims by the agency for refund of amounts paid "due to error, fraud or abuse," id. § 45.237(4); see id. § 45.238(3)(a).

27. While UK Healthcare and the DOR did not claim that K.R.S. § 45.241 applied when they were before the Kentucky Supreme Court, they have sometimes referred to § 45.241 during the actual process of collection.

28. K.R.S. § 45.241 permits collection by the DOR of "liquidated" debts referred to the DOR by agencies. A "liquidated" debt is defined as "a legal debt for a sum certain which has been certified by an agency as final due and owing, *all appeals and legal actions having been exhausted*," § 45.241(1)(b)(1) (emphasis added).

29. UK Healthcare has not promulgated specific regulations or rules governing an appeal process for debts owed to UK Healthcare.

30. UK Healthcare and the DOR represented before the Kentucky Supreme Court in *Moore* that the general due process procedures laid out in 103 K.A.R. § 1:070 apply to collection of UK Healthcare debts "at the state agency level and after the debts have been referred to the DOR."

    a. 103 K.A.R. § 1.070(3) expressly provides for Debtor Appeal Rights, as follows:

> Debtor Appeal Rights. Unless an agency is exempt from the provisions of KRS Chapter 13B, as specifically provided in KRS 13B.020, any debtor of an agency shall have all the rights contained in that chapter to appeal the finality of its debt.

    b. KRS 13B.020 does not exempt UK Healthcare from compliance with this provision.

c. 103 K.A.R. § 1.070(2) requires the agency to mail an invoice to the debtor with information about the debt, contact information for someone who can answer questions, and instructions regarding the appeal process.

31. UK Healthcare also represented to the Kentucky Supreme Court that the appeal requirements of K.R.S. Chapter 13B apply to collection of UK Healthcare debts.

32. Chapter 13B of the Kentucky Revised Statutes lays out an appeal process for certain state agency decisions.

a. The agency must employ or contract with hearing officers, and those hearing officers are required to meet certain qualifications and undergo specific training. *See* K.R.S. §§ 13B.030, 13B.040.

b. Chapter 13B also sets forth requirements for pre-hearing notices, pre-hearing conferences, and hearing procedures. *See* K.R.S. §§ 13B.050, 13B.070, 13B.080.

c. Debtors are entitled to an in-person hearing, have a lawyer present, present evidence, and cross-examine witnesses. *See* K.R.S. § 13B.080.

d. After the hearing, the hearing officer issues a recommended order, which is then reviewed by the agency head before becoming final. *See* K.R.S. § 13B.110, 13B.120.

e. Then, the agency's final orders are subject to judicial review in the proper state Circuit Court. *See* K.R.S. § 13B.140.

33. The DOR and UK Healthcare also represented to the Kentucky Supreme Court that the protest or appeal process set forth in 103 K.A.R. § 1:070 applies "after the debts have been referred to the DOR."

34. However, § 1:010 on its face applies only to taxpayers challenging their tax assessment(s). *See e.g.* 103 K.A.R. § 1:010(2).

35. Indeed, with respect to debts referred by state agencies, the DOR's website specifically states that "there is no protest period once the debts have been referred to the Division of Collections. The protest period was granted by the referring agency and expired prior to the debt being referred. The collection process begins immediately."

## Facts Common to the Case

36. Regardless of whether Defendants' statements to the Kentucky Supreme Court were true as a matter of abstract legal theory, they are false as a description of what actually happens in the real world.

37. In reality, UK Healthcare communications do not contain any information about an appeals process.

38. The invoices distributed by UK Healthcare do not mention the patient's right to appeal the amount of the debt. The invoices do not even contain the words "appeal" or "hearing."

39. Instead, the invoices merely encourage patients to call UK Healthcare's billing department with questions about their bills. Patients are directed to call the same phone number for questions about financial aid and payment plans.

40. When patients call the billing department using the contact information on their invoices—even if they directly dispute the amount of the debt—UK Healthcare does not verbally inform patients of their appeal rights but instead directs them to set up a payment plan.

41. To the extent there actually is an appeals process at UK Healthcare, it has been and continues to be affirmatively concealed from Named Plaintiffs and the putative class members by UK Healthcare's violation of its affirmative duty, under 103 K.A.R. § 1.070(2), to provide instructions regarding the appeal process on its invoices to patients.

42. Indeed, as alleged herein, UK Healthcare and the DOR routinely evade any and all requirements to provide notice and an opportunity to contest the alleged debt. They conceal their evasions, and they misrepresent what they actually do.

43. So far as Plaintiffs are aware, since 2017, there have only been three 13B appeals of UK Healthcare billing decisions. Here, too, any appeals process that might exist in the abstract has been affirmatively—and very successfully—concealed.

44. In practice, then, UK Healthcare does not inform patients of their right to appeal prior to transferring their debts to the DOR.

45. Putative class members do not always receive an invoice before UK Healthcare transfers their debt to the DOR.

46. Putative class members do not always receive notice that UK Healthcare will refer their debt to the DOR for collection.

47. UK Healthcare does not make reasonable efforts to ensure the accuracy of a patient's address before referring the patient's debts to the DOR.

48. UK Healthcare does not always call putative class members before referring their debts to the DOR.

49. Once the putative class members' debts are referred to the DOR, the DOR does not offer any kind of appeal process to UK Healthcare debtors.

50. Putative class members do not always receive a notice from the DOR prior to collection.

51. The DOR does not make reasonable efforts to ensure the accuracy of address information before beginning collection efforts against a UK Healthcare debtor.

52. The DOR adds a twenty-five percent fee and interest to UK Healthcare debts referred to the DOR without making reasonable efforts to confirm the legitimacy of those debts.

53. The DOR levies bank accounts, garnishes wages, places liens on real estate, and offsets state tax refunds to collect UK Healthcare debts plus fees and interest.

54. The standard notices that the DOR sends to putative class members are not only insufficient, but they also inaccurately state the collection methods that the DOR will and can utilize.

55. The DOR threatens to publish the names of delinquent debtors, offset their federal tax refunds, levy Social Security funds and other exempt income, and take personal property to coerce people into entering payment plans.

56. In short, thousands of UK Healthcare debtors have no recourse if they disagree with the amount of their debt; their only options are to pay or let the DOR collect the full amount of the debt plus exorbitant fees and interest.

## The UK Healthcare Financial Assistance Program

57. UK Healthcare has a "Financial Assistance" program that provides discounts on medical bills to patients who meet specific, identified criteria.

58. The Financial Assistance program involves more than patients' mere unilateral hopes or expectations. Rather, the program is an entitlement: UK Healthcare "*shall determine*, based upon the application guidelines and required supporting docu-

mentation, whether a patient is eligible for Financial Assistance," and such assistance then "reliev[es] or reduc[es] the patient's obligation to pay per predetermined guidelines." The eligibility criteria and the amount of the benefit are expressly set forth in the program documentation.

59. The Financial Assistance program requires that "UK HealthCare *shall* attempt to make patients aware of the FAP as early as possible in the treatment process" (emphasis added). This requirement is likewise triggered if a patient inquires or expresses concern about cost at or after the time of treatment.

60. By its terms, the Financial Assistance program is available at any time from the rendering of services to the time the patient's account is referred to a third party for collection, at which point it is no longer available.

61. UK Healthcare's referral of a medical debtor's account to DOR without any notice whatsoever constitutes (in addition to the other violations alleged herein) deprivation of a valuable benefit (the Financial Assistance program) without due process (or, indeed, any process at all).

62. Central Kentucky Management Services, Inc. (CKMS) is a not-for-profit corporation organized, in effect, as a subsidiary of the University of Kentucky and is engaged in the business of collecting medical debts. To the extent that CKMS is a third party within the meaning of the Financial Assistance program, UK Healthcare's referral of medical debts to CKMS, without notice or the opportunity to be heard, likewise constitutes a due process violation.

# The Named Plaintiffs

## *Plaintiff Lucy Alexander*

63. Ms. Alexander lives in Simpsonville, Kentucky. She works as a multimodality radiologic technologist at Frankfort Regional Medical Center.

64. On or around May 7, 2012, Plaintiff Lucy Alexander underwent hernia repair surgery at UK Healthcare's A.B. Chandler Hospital. Prior to the procedure, a UK Healthcare employee assured Ms. Alexander that UK Healthcare had obtained preauthorization for coverage of the procedure with Ms. Alexander's insurer, Blue Cross Blue Shield.

65. After the procedure, Ms. Alexander received a letter dated May 10, 2012 from Blue Cross Blue Shield saying that her plan did not cover the procedure. More specifically, the letter stated that "treatment or correction arising from weight control procedures are not covered by this plan."

66. Nevertheless, she later received a bill from UK Healthcare dated August 13, 2012 showing that Blue Cross Blue Shield had covered the procedure, paying $21,544.48 of the $25,040.93 bill.

67. In fact, Blue Cross Blue Shield was adhering to its position that the procedure was a consequence of a previous weight control procedure and thus, in its view, was not covered. The UK Healthcare bill dated August 13, 2012 was thus a false representation of a material fact.

68. Under the heading "Important Message," the bill states,

## Important Message

Thank you for choosing UK HealthCare for your health care needs.

The amount listed above is now due. Please remit your payment or contact our Business Office at (800) 288-2779 or (859) 257-8111. Our payment options include Discover, Master Card, Visa and American Express. We will work with you to resolve this account balance. If a payment plan is not established, payment in full for this amount is expected.

69. Below that, in a section titled "Contact Us," the bill states,

## Contact Us

If you have any questions regarding this statement or have any additional information, please contact us by:
Phone: (859) 257-8111 or toll free at (800) 288-2779
Office Hours: 8 a.m. - 4:30 p.m. ET
Email: patientaccounts@email.uky.edu

70. Ms. Alexander called the listed phone number multiple times trying to understand the difference between the May 10, 2012 letter from her insurance carrier and the August 13, 2012 UK Healthcare bill. In fact, she estimates that in a two-year period, she and her husband called UK Healthcare dozens of times attempting to sort out the bill.

71. In the course of those phone conversations (but well more than six months after receiving the Blue Cross Blue Shield letter), Mr. and Ms. Alexander discovered that after the procedure, UK Healthcare decided that they had miscoded the claim they sent to Blue Cross Blue Shield for preauthorization prior to the surgery.

72. Five months after receiving the August 2012 bill, Ms. Alexander received another UK Healthcare bill dated March 28, 2013 showing that she owed $25,340.93 for the procedure. The bill also showed that Blue Cross Blue Shield did not cover any of the charges.

73. Like the August 2012 bill, the backside of the March 2013 bill contained the following additional information:

**In case of discrepancies or inquiries about your bill**
Send your inquiry in writing so that we receive it within 60 days after the mailed date. Your written inquiry must include:

1. Your name and account number.
2. A description of the error and why you believe it is an error.
3. The dollar amount of the suspected error.

Your insurance coverage is a contract between you and your insurance company. Any questions or disputes concerning their payments or denial of coverage is a matter between the insured and the insurance company.

Please direct all correspondence to:
UK HealthCare
Patient Accounts Department
Room C101 800 Rose St.
Lexington, KY 40536-0293

**Payment plan**
If you are unable to pay your balance(s) in full, a payment plan may be approved in accordance with our financial policy. For more information, please call us at **(859) 257-8111** or toll free **(800) 288-2779** or e-mail us at patientaccounts@email.uky.edu.

**What if I cannot pay my bill?**
UK HealthCare has a variety of options available to our patients. We will assist you in determining if you qualify for financial assistance or if there are programs available that may help pay your balance. Please contact us by phone at **(859) 257-8111** or toll free **(800) 288-2779**.

**Insurance Information**
You have several ways to provide us with your current health plan information. You may complete the form below, e-mail us at patientaccounts@email.uky.edu, call us at **(859) 257-8111** or toll free **(800) 288-2779**, to submit the corrected or new information.

74. Despite repeated phone calls to UK Healthcare attempting to resolve the billing issue, Ms. Alexander continued receiving copies of the $25,340.93 UK Healthcare bill in December of 2013 and January of 2014.

75. None of Ms. Alexander's UK Healthcare bills contained a statement regarding any right to appeal the bill's amount.

76. The bills also reveal that Ms. Alexander was charged the full chargemaster rate for the procedure, without any reductions that an uninsured patient would receive. Ms. Alexander also did not receive the benefit of a negotiated rate that an insurance carrier would have received. Instead, knowing that Ms. Alexander would have no way of challenging the amount of the debt once they referred it to the DOR, UK Healthcare benefited from charging the highest rate for the procedure while refusing to correct their own preauthorization mistake or work with Ms. Alexander's insurance company to resolve the dispute.

77. In March of 2014, Ms. Alexander obtained a letter from the surgeon who performed her hernia surgery which stated as follows:

Dear Sir:

I am writing to you regarding Lucy Alexander.

On May 7, 2012, she underwent a laparoscopic repair of an incisional hernia. She has a history of a gastric bypass in 2009. She had an internal hernia repair in 2011; both of these were performed at an outside facility.

She was referred to my office from the University of Kentucky Family Medicine Service due to a painful abdominal bulge. She underwent a laparoscopic repair for an incisional hernia without complications. Following her operation, she learned that her insurance policy would not cover complications of gastric bypass. At the time of performing the procedure, we were not aware of this stipulation and apparently the patient was not aware of this either. Apparently, she is being asked to pay $1,000 per month for payments. This is unaffordable to her.

I am writing to request that you reconsider the decision to not provide coverage for her incisional hernia repair. This was clearly medically necessary. I believe the issue of this incisional hernia being related to a complication of gastric bypass represents a gray area. Although the incisional hernia occurred as a result of the midline laparotomy, I do not believe this complication is unique to gastric bypass. As a result, both I and the patient were not aware that she would not receive medical coverage for the procedure. The hospital bills for this undoubtedly are creating a medical hardship for her.

If you have any questions please do not hesitate to contact me.

Sincerely,

J. Scott Roth, M.D, F.A.C.S.
Professor of Surgery
Chief, Gastrointestinal Surgery
Director, Minimally Invasive Surgery

78. When Ms. Alexander submitted the letter to her insurance company, Blue Cross Blue Shield stated that the time to appeal their decision had long passed. In fact, based on their May 10, 2012 letter to Ms. Alexander, her time to appeal expired more than four months before she received the first bill from UK Healthcare showing that her insurance company did not pay the claim. The May 10, 2012 letter states that Ms. Alexander has 180 days from receiving the letter to appeal Blue Cross Blue Shield's determination. The first UK Healthcare bill Ms. Alexander re-

ceived showing that she owed $25,340.93 was dated March 28, 2013, 142 days after the 180-day deadline had passed.

79. UK Healthcare's misrepresentation as to coverage thus caused Ms. Alexander to lose her right to contest coverage with the carrier.

80. Despite Ms. Alexander's long and repeated attempts to resolve the issue with UK Healthcare, UK Healthcare submitted the bill to the DOR for collection.

81. No one from UK Healthcare ever called Ms. Alexander about the bill.

82. In all her phone calls and conversations with UK Healthcare employees, no one from UK Healthcare ever informed Ms. Alexander that she had a right to appeal the bill's amount. Quite to the contrary: every time she tried to get a resolution of the miscoding, she was simply told to set up a payment plan. Had Ms. Alexander received notice of a right to appeal, she would have availed herself of that right and raised the miscoding and the fact that she was informed, before the procedure, that it had been pre-authorized by her insurance.

83. Ms. Alexander did not know that the DOR had received the bill for collection until 2015 when her employer, Frankfort Regional Medical Center, sent her entire bi-weekly paycheck to the DOR in response to a request for levy.

84. Ms. Alexander received no advance warning that DOR intended to seize her entire paycheck.

85. Because Ms. Alexander had arranged for most of her monthly bills to be automatically withdrawn from her bank account, she had to pay several overdraft fees the month her check was garnished. She couldn't buy groceries for her family that month and worried that the DOR would continue garnishing the full amount of her paycheck.

86. Accordingly, Ms. Alexander decided to go in-person to the DOR in Frankfort in hopes of resolving the billing dispute. During her visit, Ms. Alexander explained her dispute with UK Healthcare in detail, but the DOR employees stated that it was too late to contest the bill. DOR employees told her that they would continue to garnish her wages until she paid the full debt ($25,340.93) unless she immediately set up a payment plan. She agreed to pay $200.00 per month when DOR employees told her that was the lowest amount they would accept.

87. Shortly thereafter, Ms. Alexander began receiving monthly notices showing how much she paid on the debt and how much she owed. The notices show that the DOR added a $6,335.23 fee to her original $25,340.93 bill.

88. According to a recent DOR notice Ms. Alexander received, she has paid $20,191.45 as of January 8, 2020. She still owes $16,576.69 according to the same notice. Interest in the amount of $5,091.98 has been added to the original bill along with the DOR's twenty-five percent fee.

89. Every year since 2015, the DOR has offset Ms. Alexander's state tax refund.

90. The DOR has never informed Ms. Alexander in any way that she has a right to appeal the amount of the debt.

91. Ms. Alexander was not and, due to Defendants' concealment alleged herein, could not reasonably have been aware of his rights to (a) notice and (b) a hearing at which to contest her alleged debts until some time after she consulted Kentucky Equal Justice Center on June 6, 2019.

92. If Ms. Alexander would have known about her right to appeal the amount of her debt, she would have done so.

93. Paying $200.00 per month to the DOR and losing her state tax refund every year presents a significant financial hardship for Ms. Alexander and her family.

94. Ms. Alexander expects to continue filing tax returns in upcoming years.

95. Because Ms. Alexander has not yet satisfied her debt, she remains at risk of the DOR seizing her state tax refund in upcoming years.

96. She likewise remains at risk that the DOR could put a lien on her family's home for the remainder of the outstanding debt or engage in other collection procedures, all without notice or the opportunity to contest the underlying alleged debt or the collection procedures.

### *Plaintiff Mary Baughman*

97. Plaintiff Mary Baughman lives in Fayette County, Kentucky. She retired from the horse industry and has two sons and one grandchild.

98. In 2011, at the age of 60, Ms. Baughman underwent a series of procedures at UK Healthcare facilities. After experiencing chest pains, Ms. Baughman underwent an echocardiogram and an endoscopy. After discovering a friend had colon cancer, Ms. Baughman decided to have her first preventative colonoscopy.

99. Ms. Baughman has frequently worked on horse farms throughout her life, but in 2008, she lost her regular job when the economy declined. In 2011, she was still between jobs and uninsured. Because she did not have health insurance, Ms. Baughman was careful to ask questions about the price of the colonoscopy, since she expected to pay for the procedure out-of-pocket.

100. After the colonoscopy, Ms. Baughman's doctor recommended that she follow up with a CT scan of her abdomen. Ms. Baughman's doctor explained that the colonos-

copy did not reveal any definitive irregularities, but a CT scan would ensure that everything was in good order.

101. After pressing the doctor for more information about the necessity of the additional procedure, Ms. Baughman asked how much the CT scan would cost. When the doctor said that she had no idea, Ms. Baughman explained that she was uninsured and requested that the doctor find out. The doctor stated she had no way of knowing how much the procedure would cost but insisted that Ms. Baughman should have the procedure and represented that it would not be very much money.

102. Ms. Baughman followed her doctor's orders and had the CT scan, which revealed no abnormalities. In total, Ms. Baughman was charged $3,665.53 by UK Healthcare for the CT scan and $292.00 by Kentucky Medical Services Foundation (KMSF) for the radiologist's services.

103. KMSF is registered as a Kentucky non-profit corporation, but according to UK Healthcare's invoices, KMSF "is the business office for providers practicing within the University of Kentucky HealthCare Enterprise." Upon information and belief, UK Healthcare refers KMSF debts to the DOR as though the debts are owed directly to UK Healthcare.

104. Ms. Baughman first received notice from the DOR on or about October 19, 2012. The notice states:

```
RE: DELINQUENT DEBT

PURSUANT TO KRS 45.241 ET SEQ. YOUR DEBT HAS BEEN SUBMITTED TO THE
DEPARTMENT OF REVENUE FOR COLLECTION.  IF THIS DEBT IS NOT PAID WITHIN
10 DAYS, THE FOLLOWING ADMINISTRATIVE COLLECTION ACTIONS MAY BE TAKEN
TO COLLECT THE DEBT DUE:

    SEIZURE MAY BE MADE ON ALL PROPERTY OR RIGHTS TO PROPERTY, BOTH
    REAL AND PERSONAL.  THIS INCLUDES, BUT IS NOT LIMITED TO, THE
    ATTACHMENT OF ANY FUNDS HELD BY A BANK ON YOUR BEHALF, AND WAGES
    PAID TO YOU BY YOUR EMPLOYER, AND THE SEIZURE AND SALE OF ANY
    REAL ESTATE YOU MAY OWN.

    A NOTICE OF STATE LIEN MAY BE FILED WITH YOUR COUNTY CLERK. THIS
    LIEN WILL ENCUMBER ALL REAL AND PERSONAL PROPERTY YOU NOW OWN OR
    MAY ACQUIRE IN THE FUTURE.  IT SHOULD BE UNDERSTOOD THAT THE
    FILING OF A LIEN MAY BE REFLECTED IN CREDIT RECORDS MAINTAINED BY
    VARIOUS CREDIT BUREAUS.

    ANY TAX REFUND OR OTHER MONIES THAT MAY BECOME DUE TO YOU FROM
    THE COMMONWEALTH MAY BE OFFSET TO YOUR OUTSTANDING DEBT.

TO AVOID THESE COLLECTION ACTIONS, PAYMENT IN FULL MUST BE SUBMITTED
WITHIN 10 DAYS. PLEASE MAKE CHECK PAYABLE TO THE KENTUCKY STATE
```

105. The letter concludes with payment instructions and then says, "[i]f you have any questions concerning your debt, please contact the Division of Collections," followed by a phone number.

106. The letter does not mention any appeal rights or procedure.

107. Attached to the letter is a Schedule of Debt showing $10,594.78 as the total amount due which includes the DOR's twenty-five percent collection fee plus interest. On the CT scan alone, the DOR charged Ms. Baughman $806.11 in collection fees.

108. Shortly thereafter, Ms. Baughman received yet another letter from the DOR in the mail dated October 23, 2012. The letter states that because of Ms. Baughman's unpaid debt, a "state lien has been filed in the appropriate County Clerk's office." Further, the letter states that the DOR "may include your name on a list of delinquent

debtors which may be published for public inspection in newspapers and the Internet if the debt remains unpaid sixty (60) days from the date of this notice."

109. If engaged in by a private debt collector, this threat would constitute a *per se* violation of the prohibition against actions "the natural consequence of which is to harass, oppress, or abuse" the debtor. 15 U.S.C. § 1692d(3).

110. The letter goes on to say that the DOR will not publish Ms. Baughman's name if she has filed an appeal or protest as of the date of the letter or if the statute of limitations for enforced collection action has expired. Nevertheless, the letter contains no instructions for how to file an appeal, nor does it state the statute of limitations for collection of the named debt.

111. The letter also states that the DOR will refrain from publishing Ms. Baughman's name in the list of delinquent debtors if she has established a payment agreement with the DOR and is current on payments.

112. Concerned about the DOR's threats to publish her name and to seize all of her personal possessions, including the money in her bank account, Ms. Baughman called the DOR and asked for an appointment. During her scheduled meeting with DOR employees, she specifically asked that they reduce the fees and interest so that she might eventually be able to pay off the debt.

113. The DOR employee(s) told Ms. Baughman that the DOR would not reduce the amount of the debt or the fees and interest and that she should immediately set up a payment plan.

114. Ms. Baughman set up a payment plan for $30.00 per month. It was all she could possibly afford, and even that amount was a hardship for her.

115. Thirty dollars per month, however, is less than the interest Defendants are charging on the purported debt. Even if Ms. Baughman were to live forever, she would *never* pay off the supposed debt.

116. Thus, in May of 2019, Ms. Baughman received a letter saying that she now owes $11,106.58 — $500 *more* than she "owed" when the DOR first started chasing her. The 2019 notice contains identical threatening language to the first notice she received in October of 2012.

117. Ms. Baughman is 69 years old and lives on a fixed income. Constantly receiving threatening letters from the DOR without sufficient notice of her rights or an opportunity for a fair hearing presents a serious hardship for Ms. Baughman.

118. Neither the DOR nor UK Healthcare nor KMSF notified Ms. Baughman that she has a right to appeal the amount of the debt or described the process for doing so.

119. Due to Defendants' misrepresentations and concealment, Ms. Baughman did not know until some time after she consulted Kentucky Equal Justice Center on July 15, 2019 of any rights she had (a) to notice of an opportunity to appeal and (b) to appeal.

120. If Ms. Baughman would have known about her right to appeal the amount of her debt to UK Healthcare, she would have done so.

121. Had she been given *any* proper form of notice, or *any* appropriate hearing with respect to her medical and hospital bills, Ms. Baughman could have raised her doctor's cost assurances and would surely owe far less than UK Healthcare and the DOR claim—quite possibly nothing at all.

122. Ms. Baughman remains at risk that the State will take additional steps to collect the money it says she owes, all without notice or the opportunity to contest the under-

lying alleged debt or the collection procedures. She lives on a small fixed income; any aggressive collection action by the DOR could cause her irreparable harm, including eviction.

### *Plaintiff Robert Moody*

123. Mr. Moody has received HIV treatment at UK Healthcare clinics ever since his HIV diagnosis in 2001.

124. Mr. Moody's medical bills are supposed to be reduced by funding from the Ryan White HIV/AIDS program. In addition, he qualified for and received Financial Assistance from UK Healthcare through 2007.

125. Mr. Moody qualified for Financial Assistance at UK Healthcare from 2008 to 2009. Under the terms of the program, UK Healthcare should have provided Mr. Moody with Financial Assistance renewal applications at the time of his receipt of services in early 2008, but UK Healthcare failed to do so.

126. UK Healthcare did not correct its omission until, at the earliest, September 2008.

127. Even though he was employed by the University of Kentucky for part of that time period, the University did not give Mr. Moody enough work hours to qualify for employer sponsored health insurance, nor did he make enough money to be able to afford a health insurance plan. He also did not meet the eligibility requirements for Medicaid.

128. Mr. Moody received dozens of confusing bills and statements from UK Healthcare and its subsidiaries, CKMS and KMSF, for services he received from 2008 to 2009.

129. The KMSF bills indicate that if he has questions, he should contact "Sue Metts" followed by a phone number. None of the KMSF bills that Mr. Moody received contained any information about what to do if he wanted to contest the bill. Further,

none of the bills he received mention his right to appeal the amount or discuss the appeals process.

130. The bills Mr. Moody received from UK Healthcare for services he received at A.B. Chandler Hospital have the same "Contact Us" section as Ms. Alexander's bills. The bills also contain form language about discrepancies, payment plans, and financial aid, none of which refers in any way to a right to dispute the bill or obtain a hearing or other determination by a neutral decisionmaker to resolve the dispute.

131. Like the UK Healthcare bills of the other Named Plaintiffs, Mr. Moody's bills from UK Healthcare do not contain the words "hearing" or "appeal," nor do they contain any explanation of appeal rights or information about how to appeal the amount of a bill.

132. Many of the notices Mr. Moody received from CKMS also bear no discernible relationship to the bills that he received from UK Healthcare and KMSF. Frequently, the bill amounts and account numbers on the CKMS notices did not match up with any of Mr. Moody's bills from KMSF. The bills also contain no service dates or itemization.

133. The CKMS notices appeared to be from a private debt collector. They gave no indication that Mr. Moody was, or could be, subject to extra-judicial collection procedures by the DOR.

134. Mr. Moody never received a phone call from UK Healthcare or any of its subsidiaries.

135. Despite repeated attempts, Mr. Moody could not resolve the billing disputes he had with UK Healthcare.

136. On receipt of the Financial Assistance application in September 2008, Mr. Moody applied for such aid. He provided proof that his income was well within UK Healthcare's limits for financial aid in 2008 and 2009.

137. But not long after he submitted the complete financial assistance form, Mr. Moody began receiving notices from the DOR. Like Ms. Baughman, Mr. Moody received a notice threatening to publish his name on a list of delinquent debtors in the newspaper or on the internet if he did not pay his debts immediately or enter into a payment agreement.

138. The DOR also threatened to offset Mr. Moody's federal tax refund for nonpayment. That threat would have been impossible for the DOR to carry out, because Mr. Moody's medical debt was not eligible for federal tax refund offset under 26 U.S.C. § 6402. In other words, the DOR asserted powers it did not have in its effort to coerce Mr. Moody to enter into a payment plan.

139. To make matters worse, each DOR notice indicated a different amount due. For example, one notice dated October 8, 2009 stated Mr. Moody owed $4,152.58 (plus a $1,038.15 fee and interest). Another notice from October 8, 2009 stated he owed $200.59 (plus a $50.15 fee and interest). A third notice from the same date stated that he owed $344.83 (plus a $86.21 fee and interest), and a fourth notice from October 8, 2009 stated that he owed $321.84 (plus an $80.46 fee and interest).

140. UK Healthcare referred the asserted debts to CKMS and DOR without notice to Mr. Moody. Those referrals had the effect, under the terms of the Financial Assistance program, of cutting off Mr. Moody's then-existing right to financial assistance with respect to the "debts" sought to be collected.

141. Mr. Moody had been sued in Fayette District Court in the past by CKMS to collect earlier, different debts. Thus, he understood that forum would be the place in which he could contest the billings. No one ever told him that he had any right to contest billings prior to being sued, and no one ever told him that UK Healthcare could avail itself of judicial remedies such as wage garnishment without ever going to court and without ever having to afford him the opportunity to dispute the amount owed.

142. Nevertheless, Mr. Moody remained proactive, contacting his state senator in hopes of getting help. When he received the DOR's "Final Notice Before Seizure" letter threatening to seize his real and personal property, including his bank accounts, tax refunds, and wages, Mr. Moody mailed the DOR a notice via certified mail contesting the debt.

143. Despite these efforts, Mr. Moody discovered that the DOR put a lien on the home that he shares with his mother, which is deeded to him and his brother jointly. The DOR only agreed to lift the lien when Mr. Moody entered into a payment agreement.

144. None of the notices Mr. Moody received from the DOR contained information about his appeal rights or how to appeal the amount of the debt.

145. Mr. Moody was not and, due to Defendants' concealment alleged herein, could not reasonably have been aware of his rights to (a) notice and (b) a hearing at which to contest his alleged debts until some time after he consulted Kentucky Equal Justice Center on July 5, 2019.

146. If Mr. Moody had known about his right to appeal the amount of the debt to UK Healthcare, he would have done so.

147. As of July 2019, the DOR appears to be asserting that Mr. Moody owes close to $4,000 for bills he received from KMSF and UK Hospital from 2008 to 2009 related to doctor's visits, in-office treatment of an abscess, liver biopsy, ear wax removal, two vaccines, and lab work.

148. Pursuant to the terms of his payment plan, Mr. Moody remains at risk that the DOR will offset tax refunds or take other collection action in its discretion, all without notice or the opportunity to contest the underlying alleged debt or the collection procedures.

### Plaintiff Danny Metts

149. Mr. Metts is 67 years old and retired from the service and transportation industry. He currently resides in Jessamine County, Kentucky.

150. Based on his cancer diagnosis and other health issues, Mr. Metts applied for and began receiving Social Security Disability Insurance and Medicare coverage approximately a decade ago.

151. Around the same time, Mr. Metts and his wife moved to Kentucky from Tennessee to be near his daughter and grandchildren. After moving to Kentucky, Mr. Metts applied for and received Medicaid coverage to supplement his Medicare coverage.

152. In approximately November of 2016, Mr. Metts began receiving radiation treatment for his prostate cancer at UK Healthcare's Markey Cancer Center. Before Mr. Metts' doctors placed the markers to direct the radiation, a UK Healthcare employee told him that she had preauthorized the procedure with Medicaid and Medicare and that the full amount would be covered.

153. Several hours later, the UK Healthcare employee confirmed that the procedure would be fully covered, and his doctors placed the markers in preparation for the radiation.

154. Not long after the procedure, a UK Healthcare employee told Mr. Metts that he should ignore any bills he received from UK Healthcare because Medicaid would cover all charges that Medicare did not.

155. Mr. Metts received regular radiation treatments at the Markey Cancer Center from November of 2016 through January of 2017.

156. In January of 2017, Mr. Metts went to UK Healthcare's billing office after his last radiation treatment. There he told a UK Healthcare employee that he wanted to check how much he owed and set up a payment plan if necessary.

157. The UK Healthcare employee reiterated that Mr. Metts would not owe anything. Again, he was told that he should ignore any UK Healthcare bills he received. The UK Healthcare employee explained that the bills would simply reflect what UK Healthcare billed his insurance; he was told that state law prohibited UK Healthcare from balance billing Medicaid recipients.

158. Mr. Metts did begin receiving medical bills around April of 2017 for the November and December 2016 radiation treatments. UK Healthcare bills from April to September of 2017 indicate that Mr. Metts was covered by Medicare and Medicaid for the billed radiation treatments.

159. Mr. Metts' UK Healthcare bills contain the same "Important Message" and "Contact Us" sections as the UK Healthcare bills received by other Named Plaintiffs.

160. Like the bills of the other Named Plaintiffs, the second page of Mr. Metts' UK Healthcare bills reads as follows:

Tax ID: 61-6001218

**UKHealthcare's financial policy**
Even though you may have insurance, you as a patient/guarantor are primarily responsible for payment of this bill. Payment is due upon receipt of this statement. It is important to remember that health insurance coverage varies and not all charges are covered or paid in full. When your insurance denies a claim or does not pay in full, you are responsible for the remaining balance.

Some health care professionals may not be participating providers in the same insurance plans as UK HealthCare. In these cases, you may have a greater financial responsibility for these services than you would otherwise. Due to the large number of plans that we accept and the complexity of each plan, we suggest that questions about coverage or benefit levels be directed to your health care plan.

**In case of discrepancies or inquiries about your bill**
Send your inquiry in writing so that we receive it within 60 days after the mailed date. Your written inquiry must include:

1. Your name and account number.
2. A description of the error and why you believe it is an error.
3. The dollar amount of the suspected error.

Your insurance coverage is a contract between you and your insurance company. Any questions or disputes concerning their payments or denial of coverage is a matter between the insured and the insurance company.

Please direct all correspondence to:
UK HealthCare
Patient Accounts Department
PO Box 1688
Lexington, KY 40588-1688

**Payment plan**
If you are unable to pay your balance(s) in full, a payment plan may be approved in accordance with our financial policy. For more information, please call us at **(859) 278-8218** or toll free **(800) 294-3708** or e-mail us at patientaccounts@email.uky.edu.

**What if I cannot pay my bill?**
UK HealthCare has a variety of options available to our patients. We will assist you in determining if you qualify for financial assistance or if there are programs available that may help pay your balance. Please contact us by phone at **(859) 278-8218** or toll free **(800) 294-3708**.

**Insurance Information**
You have several ways to provide us with your current health plan information. You may complete the form below, e-mail us at patientaccounts@email.uky.edu, call us at **(859) 278-8218** or toll free **(800) 294-3708**, to submit the corrected or new information.

161. None of the UK Healthcare bills that Mr. Metts received indicated that he had a right to appeal the amount of the bill.

162. In November of 2017, Mr. Metts received another UK Healthcare bill for a December 2016 radiation treatment, but this bill indicated that he was only insured by Medicare, not Medicaid.

163. Around that time, a UK Healthcare employee called Mr. Metts and confessed that UK Healthcare had made a mistake. According to the UK Healthcare employee, Mr.

Metts was not properly enrolled in Medicaid at the time of his radiation treatments, contrary to the bills he received and the statements made by other UK Healthcare employees before and after the treatments.

164. Mr. Metts would have qualified for UK Healthcare's Financial Assistance Program based on his and his wife's income and assets at the time.

165. The UK Healthcare employee advised Mr. Metts to apply for Medicaid's spend-down program with the Kentucky Department of Community Based Services (DCBS), as a necessary step in obtaining Financial Assistance from UK Healthcare.

    a. Had Mr. Metts applied for the spend-down program within three months of the radiation treatments, the spend-down program would have significantly reduced any amounts owed by Mr. Metts.

    b. Because of UK Healthcare's error, however, the UK Healthcare employee admitted that DCBS would deny Mr. Metts' application for the spend-down program, because the deadline to apply had passed months ago. In other words, UK Healthcare's misrepresentation of coverage caused Mr. Metts to lose the valuable right to Medicaid spend-down coverage.

    c. The UK Healthcare employee told Mr. Metts that the spend-down application was still necessary and advised Mr. Metts to obtain a denial letter and present it to UK Healthcare so that they could enroll him in their Financial Assistance program.

166. Mr. Metts did as the UK Healthcare employee advised. He went to the DCBS office immediately and applied for the spend-down program. When DCBS denied his application as untimely, Mr. Metts presented the denial notice to UK Healthcare as requested.

167. Sometime later, another UK Healthcare employee called Mr. Metts. This UK Healthcare employee stated that Mr. Metts owed a large amount for his radiation treatments and would need to make a $5,000.00 lump sum payment immediately and then establish a payment plan.

168. When Mr. Metts told the UK Healthcare employee that he did not have $5,000.00, she advised him to put the payment on a credit card. When Mr. Metts explained that he submitted the DCBS spend-down denial letter to qualify for UK Healthcare's financial aid program, the UK Healthcare employee stated she had no idea what Mr. Metts was talking about.

169. When Mr. Metts said that he would not give the UK Healthcare employee his credit card information, the UK Healthcare employee asked if there was anyone else he could ask for the money. Mr. Metts reiterated that he did not have access to the amount she was requesting. The UK Healthcare employee responded by telling Mr. Metts that they would just take the money out of his bank account. The UK Healthcare employee stated that UK Healthcare is not like other hospitals. She stated that UK Healthcare would not have to sue him to collect the debt; they would just turn the debt over to the DOR who would levy his bank account. At this point in the conversation, Mr. Metts decided that the UK Healthcare employee could not possibly be telling the truth and ended the phone call.

170. For over a year, Mr. Metts called and attempted to visit the social worker at the Markey Cancer Center at least a dozen times hoping to resolve the billing issues. However, Mr. Metts' calls were not returned, and when he visited, the social worker was not available.

171. In all of his conversations with UK Healthcare employees, no one informed Mr. Metts of his right to appeal the amount of his UK Healthcare debts.

172. If Mr. Metts had known he had a right to appeal the amount of the debts, he would have done so.

173. In January of 2019, Mr. Metts received his first DOR notice, confirming the statements made by the last UK Healthcare employee with whom he spoke. The body of the notice reads as follows:

RE: Delinquent Debt

Pursuant to KRS 131.020(1)(c)(2), and where applicable KRS 134.547, your debt totaling $5,713.48 has been referred to the Department of Revenue for collection. If this debt is not paid within 10 days, the following administrative collection actions may be taken to collect the due and owing debt:

Seizure may be made on all property or rights to property, both real and personal. This includes, but is not limited to, the attachment of any funds held by a bank on your behalf, any wages paid to you by your     employer, and the seizure and sale of any real estate you may own.

A Notice of State Lien may be filed with your County Clerk. This lien will encumber all real and personal property you now own or may acquire in the future. It should be understood that the filing of a lien may be reflected in credit records maintained by various credit bureaus.

Any tax refund or other monies that may become due to you from the Commonwealth may be offset to your outstanding debt.

To avoid these collection actions, payment in full must be submitted within 10 days. Any payments by check should include the following processing ID: 10000291895, be made payable to the Kentucky State Treasurer and mailed to the address below. Payments may also be made by calling the telephone number provided below or online at https://iia.ky.gov/PayKYCollectionCase.jsp. Please use the case number in red in the upper right hand corner to login and make your payments. If you have any questions concerning your debt, please contact the Division of Collections at the following address or phone number.

ENTERPRISE COLLECTIONS
DIVISION OF COLLECTIONS
Department of Revenue
501 HIGH STREET
P.O. BOX 491
FRANKFORT, KY 40602-0491
PHONE: (502)564-4921 Ext. 5368
FAX: (502)564-9571

174. The attached Schedule of Liabilities shows eighteen unspecified charges from November of 2016, twenty unspecified charges from December of 2016, and two unspecified charges for January of 2017, forty charges total. Altogether, the principal

amounts charged by UK Healthcare add up to $4,524.30, and the notice shows that

the DOR added interest plus a $1,131.17 fee.

175. A few weeks later, Mr. Metts received a DOR notice titled "FINAL NOTICE BE-

FORE SEIZURE" and dated February 15, 2019, which reads as follows:

Department records indicate that the amount referenced in the attached schedule, totaling
$5,743.85 has not been paid. To avoid seizure action, as provided in KRS 131.500 through
131.540, and where pertinent, KRS 45.238(1), KRS 45.241(6)(d) and (8) or KRS 134.504(12)(a),
full payment of the amount due must reach this office by 03/14/2019. Please make check
payable to the Kentucky State Treasurer and forward with this notice. Payments may also be
made by calling the telephone number provided below or online at
https://iia.ky.gov/PayKYCollectionCase.jsp. Please use the case number in the upper right hand
corner to login and make your payments.

SEIZURE MAY BE MADE OF ALL YOUR PROPERTY OR RIGHTS TO PROPERTY INCLUDING
PROPERTY DISCLOSED TO THE DEPARTMENT THROUGH INFORMATION OBTAINED FROM THE
INTERNAL REVENUE SERVICE PURSUANT TO 26 USC 6103(d). THIS INCLUDES, BUT IS NOT
LIMITED TO, THE ATTACHMENT OF ANY FUNDS HELD BY A BANK ON YOUR BEHALF, ANY
WAGES PAID TO YOU BY YOUR EMPLOYER, AND THE SEIZURE AND SALE OF ANY OF YOUR
REAL ESTATE. If any liability that is the basis of this notice is INCOME or WITHHOLDING TAX
and if the liability remains unpaid after 60 days from the date of this notice, any FEDERAL
INCOME TAX REFUND to which you may be entitled may be offset. If you believe that all or a
portion of your liability is not past due or is not legally enforceable, you may, within 60 days
from the date of this notice, present evidence to support your position. After reviewing your
evidence, the Department will notify you of its decision before any offset action is taken.

If you have questions concerning this liability, please contact the DIVISION OF COLLECTIONS at
the address or phone number below.

ENTERPRISE COLLECTIONS
DIVISION OF COLLECTIONS
Department of Revenue
501 HIGH STREET
P.O. BOX 491
FRANKFORT, KY 40602-0491
Phone: (502)564-4921 Ext. 5368
Fax: (502)564-9571

176. When Mr. Metts first began receiving the DOR notices, he thought the notices were

fake. When he called the phone number on the notices, he was confused when the

person who answered said he reached "Enterprise Collections." When Mr. Metts

stated that he was trying to reach the DOR, the person who answered responded

that Enterprise Collections is the DOR. Not understanding why the DOR would op-

erate under a pseudonym, Mr. Metts hung up and found the DOR's phone number

online. When he called that number though, he was directed back to Enterprise Collections.

177. Mr. Metts explained the entire billing dispute to the DOR/Enterprise employee. At first, the DOR employee indicated that if the bill was in error, they could contact UK Healthcare about the bill. However, the DOR employee stated that the DOR would ultimately do whatever UK Healthcare told them to do about the bill. According to the DOR employee, at most, having him contact UK Healthcare for Mr. Metts would just give him more time before the DOR began to collect.

178. After his initial phone call with the DOR, Mr. Metts reached out to other people for help. He called his urologist's office and explained the situation. While sympathetic, they eventually referred him back to UK Healthcare's billing department. He called the Director of UK Healthcare who passed him off to Customer Relations who passed him back to the billing department.

179. He contacted his Congressman, Representative Andy Barr, for help. The Congressman directed him to call then Governor Matt Bevin.

180. He called Governor Bevin's office and was informed that he would have to pay the money the DOR said he owed.

181. He sought help from the American Cancer Society's Patient Advocate Foundation, but after talking to the DOR, the patient advocate assigned to him said there was nothing further she could do and sent him information about public assistance programs.

182. Eventually, the DOR called Mr. Metts again, this time to say it was time for him to enter a payment agreement with the DOR to pay the remainder of the debt.

183. When he again insisted that he could not pay the debt, the DOR employee told him that the DOR could just levy his bank account if he refused to enter a payment plan. Mr. Metts informed the DOR employee that his bank account only contained funds from his Social Security Retirement check which the state could not seize. The DOR employee stated that Mr. Metts did not seem to understand how the system worked. The DOR employee explained that when the DOR sees a paycheck or other large deposit hit a bank account, they usually levy the whole bank account. The DOR employee stated that the money might ultimately be returned to Mr. Metts if it was Social Security Retirement funds, but it might take a long time and he would probably have to pay bank overdraft fees in the meantime.

184. Thus, the DOR employee was threatening to take action that is illegal under 42 U.S.C. § 407, and threatening to induce Mr. Metts's bank to take action that is illegal under 31 C.F.R. Part 212, all for the purpose of extorting Mr. Metts into entering into a payment plan.

185. The DOR employee informed Mr. Metts that he could already see everything he owned. To prove his point, the DOR employee told Mr. Metts where he banked and what kinds of cars he owned.

186. Frightened and faced with the choice of losing all of his income or entering some sort of payment agreement, Mr. Metts asked what the lowest amount was that the DOR would accept. The DOR employee was hesitant to name an amount, saying that paying the minimum would only result in Mr. Metts continually paying interest on the debt but never reaching the principal. Mr. Metts again reminded the DOR employee that he was on a fixed income and insisted that he could only pay the minimum. The DOR employee eventually told him that the minimum payment

amount was $25.00. Mr. Metts agreed to the amount on the phone but told the DOR employee that he was agreeing under duress and believed this to be blackmail.

187. Based on his conversation with the DOR employee, Mr. Metts closed his bank account, fearful that the DOR might levy all his income at one time. By closing his bank account, he lost access to a line of credit with his bank, an important resource for someone on a fixed income. Without a bank account, he was forced to use his limited income to pay money order fees every time he needed to pay a bill.

188. Mr. Metts also sent a letter to the DOR which reads as follows:

> To: Kentucky Department of Revenue    03/22/2019
>
> I, Danny Metts, dispute the wages [sic] that you are attempting to collect on behalf of UK Hospital. I had both Medicare and Medicaid Insurance at the beginning of my treatment which was verified by billing at the start of my treatment and at the end of my treatment. The last day of treatment I went to billing and they said since I had Medicare and Medicaid there would be nothing due from me.
>
> Thank you, Danny Metts [DOR account number]

189. In spite of his stated objections to the amount of the debt, the DOR never informed Mr. Metts in writing or on the phone that he had a right to appeal the amount of his UK Healthcare debts and the process for doing so. In fact, on at least one phone call with the DOR, Mr. Metts specifically asked to appeal the amount of the debt. The DOR employee responded that he could not appeal now that the debt had been transferred to the DOR.

190. If Mr. Metts had known that he had a right to appeal the amount of the debts, he would have done so. However, Defendants' misrepresentations and concealments, as alleged herein, prevented him from learning of his rights to notice and to appeal until he consulted Kentucky Equal Justice Center in February 2020.

191. The DOR eventually sent Mr. Metts a notice memorializing the Payment Agreement. According to the Payment Agreement Notice, at $25.00 a month, Mr. Metts would eventually have to pay $8,411.50 to satisfy the alleged debt. The attached Payment Schedule shows that after eight years of continuous monthly payments, he will still owe nearly $6,000.00, significantly more than the amount that UK Healthcare referred to the DOR for collection. Like Ms. Baughman, therefore, Mr. Metts could live forever and never be free of these Defendants' depredations.

192. When Mr. Metts and his wife moved to Kentucky, his daughter purchased a house for them. He hoped to secure a mortgage and buy the house from his daughter. However, the DOR's threat to put a lien against any real estate he acquires contributed to his decision not to do so.

193. Mr. Metts regularly receives confusing notices from the DOR showing different amounts due on a variety of unspecific bills.

194. Based on his interactions with the DOR and the litany of notices he receives, he is constantly worried that he will not be able to satisfy the debts in his lifetime, leaving his family with additional financial burdens. Pursuant to the terms of his payment plan, Mr. Moody remains at risk that the DOR will offset tax refunds or take other collection action in its discretion, all without notice or the opportunity to contest the underlying alleged debt or the collection procedures.

### *Plaintiff Randall Roach*

195. Plaintiff Randall Roach is a technology support specialist at the Veterans Administration. Mr. Roach lives in Bimble, Kentucky in Knox County.

196. On or about February 3, 2019, Mr. Roach was involved in a shooting accident in which multiple pellets became embedded in his body. Mr. Roach went to the near-

est hospital in Barbourville, Kentucky and was immediately transferred to UK Hospital for treatment.

197. During his three-day stay at UK Hospital, Mr. Roach underwent surgery to remove the pellets. While there, Mr. Roach disclosed that he was uninsured, and a UK Healthcare employee brought him paperwork for UK Healthcare's Financial Assistance program. When Mr. Roach disclosed his income was between $34,000 and $36,000, the UK Healthcare employee told him that he fell well within UK Healthcare's Financial Aid program and would not have to pay for the services he was receiving.

198. Before discharge, another UK Healthcare employee told Mr. Roach that he would not owe any money to UK Healthcare. The UK Healthcare employee told Mr. Roach that he would receive medical bills, but he should ignore those bills.

199. Mr. Roach did begin receiving medical bills from UK Healthcare. However, he signed up for UK Healthcare's online billing portal which consistently showed that he owed UK Healthcare $0, reassuring Mr. Roach that the statements made by UK Healthcare employees were true.

200. While at UK Hospital for his first follow-up appointment with his surgeon, Mr. Roach requested his medical records for his short-term disability policy and asked about the status of his medical bills. A UK Healthcare employee again told him that he had no bills and owed UK Healthcare no money.

201. Besides the bills, Mr. Roach never received any communication from UK Healthcare indicating that he owed any money to UK Healthcare for the treatment he received at UK Hospital.

202. None of the bills Mr. Roach received indicated that he had a right to appeal the amount of the debt.

203. UK Healthcare's false representations and material omissions affirmatively concealed from Mr. Roach, until it was too late, that he in fact owed a debt and that an appeal process existed to contest it.

204. If Mr. Roach had known that he owed a "debt" and that he had a right to appeal the amount of the debt, he would have done so.

205. In March of 2020, Mr. Roach received the following notice dated March 20 from the DOR demanding $73,815.48:

RE: Delinquent Debt

Pursuant to KRS 131.020(1)(c)(2), and where applicable KRS 134.547, your debt totaling $73,815.48 has been referred to the Department of Revenue for collection. If this debt is not paid within 10 days, the following administrative collection actions may be taken to collect the due and owing debt:

Seizure may be made on all property or rights to property, both real and personal. This includes, but is not limited to, the attachment of any funds held by a bank on your behalf, any wages paid to you by your     employer, and the seizure and sale of any real estate you may own.

A Notice of State Lien may be filed with your County Clerk. This lien will encumber all real and personal property you now own or may acquire in the future. It should be understood that the filing of a lien may be reflected in credit records maintained by various credit bureaus.

Any tax refund or other monies that may become due to you from the Commonwealth may be offset to your outstanding debt.

To avoid these collection actions, payment in full must be submitted within 10 days. Any payments by check should include the following processing ID: 10000312524, be made payable to the Kentucky State Treasurer and mailed to the address below. Payments may also be made by calling the telephone number provided below or online at https://iia.ky.gov/PayKYCollectionCase.jsp. Please use the case number in red in the upper right hand corner to login and make your payments. If you have any questions concerning your debt, please contact the Division of Collections at the following address or phone number.

ENTERPRISE COLLECTIONS
DIVISION OF COLLECTIONS
Department of Revenue
501 HIGH STREET
P.O. BOX 491
FRANKFORT, KY 40602-0491
PHONE: (502)564-4921 Ext. 5368
FAX: (502)564-9571

206. On the same day, Mr. Roach received a statement from the DOR also dated March 20, 2020. The statement indicates that the DOR offset Mr. Roach's and his wife's joint state tax refund of $653.00 on March 16, 2020 without prior notice.

207. Neither of the March 20th documents state that the $73,815.48 debt is from UK Healthcare. However, the statement showing the tax refund offset states that the debt was incurred on February 3, 2019, the same day as Mr. Roach's hospitalization at UK Hospital.

208. Mr. Roach was shocked when he received the DOR notice. He knew he would not be able to pay nearly $74,000, and with the rate of interest, he feels certain that he will not be able to pay off the debt during his lifetime.

209. A few weeks later, Mr. Roach received a "Final Notice Before Seizure" dated April 10, 2020. The body of the notice reads as follows:

> Department records indicate that the amount referenced in the attached schedule, totaling $73,572.94 has not been paid. To avoid seizure action, as provided in KRS 131.500 through 131.540, and where pertinent, KRS 45.238(1), KRS 45.241(6)(d) and (8) or KRS 134.504(12)(a), full payment of the amount due must reach this office by 05/07/2020. Please make check payable to the Kentucky State Treasurer and forward with this notice. Payments may also be made by calling the telephone number provided below or online at https://iia.ky.gov/PayKYCollectionCase.jsp. Please use the case number in the upper right hand corner to login and make your payments.
>
> SEIZURE MAY BE MADE OF ALL YOUR PROPERTY OR RIGHTS TO PROPERTY INCLUDING BUT NOT LIMITED TO, THE ATTACHMENT OF ANY FUNDS HELD BY A BANK ON YOUR BEHALF, ANY WAGES PAID TO YOU BY YOUR EMPLOYER, AND THE SEIZURE AND SALE OF ANY OF YOUR REAL ESTATE.
>
> If you have questions concerning this liability, please contact the DIVISION OF COLLECTIONS at the address or phone number below.
>
> ENTERPRISE COLLECTIONS
> DIVISION OF COLLECTIONS
> Department of Revenue
> 501 HIGH STREET
> P.O. BOX 491
> FRANKFORT, KY 40602-0491
> Phone: (502)564-4921 Ext. 5368
> Fax: (502)564-9571

210. None of the notices that Mr. Roach received from the DOR indicate that he has a right to a hearing. If Mr. Roach had known he could request a hearing to challenge the amount of the debt, he would have done so.

211. Due to UK Healthcare's repeated representations that Mr. Roach owed nothing and should ignore the bills he received, Mr. Roach did not learn, and could not reasonably have been expected to learn, prior to February 2020, that he had been injured by UK Healthcare's violation of his due process rights with respect to the bills.

212. UK Healthcare's action in referring Mr. Roach's bills to the DOR for collection ostensibly terminated the possibility of access to the Financial Assistance Program.

213. In fact, however, had either UK Healthcare or the DOR given Mr. Roach the notice and opportunity for a hearing to which he was and is constitutionally entitled, Mr. Roach could have asserted his right to Financial Assistance prior to referral.

214. Even after referral, Mr. Roach could have asserted that UK Healthcare's misrepresentations estopped UK Healthcare from using the terminations provisions to deny Financial Assistance. But Defendants' concealment of Mr. Roach's right to a hearing prevented any of that from happening.

215. Before his accident, Mr. Roach worked as a diesel mechanic. Because of his injuries, Mr. Roach can no longer work as a mechanic. Shortly before receiving the first DOR notice, Mr. Roach accepted a full-time IT job at the Veterans Administration. Working at the Veterans Administration requires an extensive federal background check.

216. The federal investigator assigned to Mr. Roach's background check has informed Mr. Roach that this unresolved DOR debt might cost him his job.

217. Mr. Roach remains at risk of levy or other collection procedures from the DOR, including the DOR's threats to garnish his wages and continue offsetting his tax refunds, all without notice or the opportunity to contest the underlying alleged debt or the collection procedures. A wage garnishment as well as continued tax refund offsets would constitute a major financial hardship for Mr. Roach and his wife and could impede Mr. Roach's ability to pay rent.

218. Before receiving the March 20, 2020 notices, Mr. Roach was hoping to purchase a home for himself and his wife. Because of the threats to put a lien against any real

estate he might acquire and because of the effect on Mr. Roach's credit score, Mr. Roach has put buying a house on hold.

## Class Allegations

219. The Named Plaintiffs bring this class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class defined as follows: All UK Healthcare patients whose bills have been or will be referred by UK Healthcare (or its subsidiaries, including but not limited to KMSF and CKMS) to the Department of Revenue for collection and who have not yet satisfied the amount the DOR states is owed.

220. The class is so numerous that joinder of all members is impractical.

221. UK Healthcare told the Kentucky Supreme Court that putting a stop to the DOR's collection efforts would cost the University of Kentucky "tens of millions of dollars." Thus, the Named Plaintiffs reasonably estimate that members of the class exceed ten thousand persons.

222. There are numerous questions of law and fact common to the class including:

   (a) whether UK Healthcare provides to its patients notice of their right to contest the existence and/or amount of their asserted medical debts before referring those debts to the DOR for collection;

   (b) whether UK Healthcare's form notices to patients contain material omissions that mislead and/or affirmatively conceal that patients have the right to contest the existence and/or amount of their asserted medical debts and that an appeal process exists for this purpose.

(c) whether UK Healthcare in fact has procedures under which patients may contest the existence and/or amount of their asserted medical debts before a neutral decisionmaker and with other appropriate due process protections;

(d) whether, under *Mathews v. Eldredge*, 424 U.S. 319 (1976), asserted UK Healthcare debtors are entitled to pre-deprivation notice and a pre-deprivation hearing before the DOR may engage in non-judicial levies against them, their wages, their bank accounts, or their other property or income;

(e) whether the DOR ensures that notice and an opportunity to contest the existence and/or amount of their referred debt have been available to UK Healthcare patients before the DOR begins collection against them;

(f) whether the DOR seizes money and property from UK Healthcare patients without affording them notice and an opportunity to be heard at any point in the process;

(g) whether the DOR collects UK Healthcare debts and adds fees and interest without utilizing a reasonable process to confirm the validity of the debt;

(h) whether the DOR's notices to UK Healthcare debtors accurately represent the rights and responsibilities of the DOR and the debtor.

223. The Named Plaintiffs' claims are typical of the members of the putative class as they are all similarly affected by Defendants' wrongful conduct. All of them are forced to pay the amounts the DOR says are owed without due process or face further collection efforts by the DOR. All of them will suffer direct, irreparable injury or loss if they are forced to pay the amounts the DOR says are due without due process.

224. Declaratory and injunctive relief are appropriate with respect to the class as a whole because Defendants have acted on grounds applicable to the class.

225. The Named Plaintiffs serving as class representatives will advance the interests of the absent class members.

226. The Named Plaintiffs have retained counsel experienced in civil rights and class action litigation.

227. Kentucky Equal Justice Center's attorneys have experience litigating class action cases, as do the attorneys from the National Center for Law and Economic Justice.

## CLAIM FOR RELIEF
### *Fourteenth Amendment Due Process Violation – Deprivation of Notice and Opportunity to Be Heard*

228. Under color of state law, defendants have violated, continue to violate, and will violate the rights of Named Plaintiffs and the putative class to due process of law under the Fourteenth Amendment to the Constitution of the United States, rights that are enforceable against these Defendants pursuant to 42 U.S.C. § 1983.

229. By failing to provide adequate notice and an opportunity to be heard prior to depriving them of their property, Defendants have violated, continue to violate, and will violate the rights of Named Plaintiffs and the putative class to due process under the Fourteenth Amendment.

## Request for Relief

WHEREFORE, Plaintiffs respectfully ask this Court to:

1. Certify this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2. Declare that Defendants have violated Named Plaintiffs' rights, and the rights of the class that they represent, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

3. Enter an injunction prohibiting Defendants from collecting UK Healthcare debts until such time as the DOR provides class members accurate and constitutionally adequate notice and an opportunity to be heard;

4. Enter an Order awarding the Named Plaintiffs and the class that they represent litigation costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Enter an Order awarding such other and further relief as the Court deems just and proper.


Dated: June 4, 2020                              Respectfully Submitted,


/s/ Elizabeth Davis Stone_____
Elizabeth Davis Stone, Esq.
KENTUCKY EQUAL JUSTICE CENTER
201 W. Short St. Ste. 310
Lexington, KY 40507
859-759-2005
betsy@kyequaljustice.org

Ben Carter, Esq.
KENTUCKY EQUAL JUSTICE CENTER
222 South First St., Suite 305
Louisville, KY 40202
502-303-4026
ben@kyequaljustice.org

Claudia Wilner, Esq. (*pro hac vice* to be filed)
Edward P. Krugman, Esq. (*pro hac vice* to be filed)
Karina Tefft (not yet admitted)
NATIONAL CENTER FOR LAW
    AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001

212-633-6967
wilner@nclej.org
krugman@nclej.org
tefft@nclej.org