UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION

LUCY ALEXANDER, MARY BAUGHMAN,
ROBERT MOODY, DANNY METTS, and
RANDALL ROACH

On behalf of themselves and all those similarly
situated,

                                    Plaintiffs,

v.

THOMAS B. MILLER, in his official capacity as
Commissioner of the Kentucky Department of
Revenue, *et al.*,

                                    Defendants.

No. 3:20-cv-00044-GFVT-EBA

**MEMORANDUM OF LAW OF PLAINTIFFS AND THE CLASS IN SUPPORT
OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT
AGAINST THE UKH DEFENDANTS**

Ben Carter
KENTUCKY EQUAL JUSTICE CENTER
222 South First St., Suite 305
Louisville, KY 40202
(502) 303-4026
ben@kyequaljustice.org

David Hymer (*pro hac vice*)
Rachel LaBruyere (*pro hac vice*)
BRADLEY ARANT BOULT
CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 521-8000
dhymer@bradley.com
rlabruyere@bradley.com

Claudia Wilner (*pro hac vice*)
Edward P. Krugman (*pro hac vice*)
Karina Tefft (*pro hac vice*)
NATIONAL CENTER FOR LAW
   AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org
krugman@nclej.org
tefft@nclej.org

***Counsel for Plaintiffs and the Class***

TABLE OF CONTENTS

*Page*

Table of Authorities .................................................................................. iv

**INTRODUCTION** ..................................................................................... 1

**STATEMENT OF FACTS** ....................................................................... 5

The Three Stages of the Collection Process ........................................ 5

The Saga of "Letter 8" and Defendants' Effort To
Prevent Hearings .................................................................................... 8

    The First Letter 8 ............................................................................... 8

    DoR's Cessation of Collections in 2012 Due to an
    Acknowledged Lack of Due Process, and Defendants'
    Decision to Keep Collecting "Pipeline" Debts
    Notwithstanding that Acknowledged Lack.................................... 9

    The Subsequent Development of Letter 8 ....................................10

    Defendant Watts Tells UKH and CKMS That Their
    Procedures Are Deficient................................................................10

    The Final Letter 8 and Letter 83 ..................................................3 11

    The Timing of Letter 8, and Its Manner of Delivery ...................12

DoR Collection Procedures After Referral to DoR ..........................14

    The 25% Fee ....................................................................................14

    The Coerced Payment Plans ..........................................................15

Named Plaintiffs' Facts........................................................................17

    Lucy Alexander (SoF ¶¶ 216-250)................................................17

    Mary (Margaret) Baughman (SoF ¶¶ 280-304) ............................19

    Robert Moody (SoF ¶¶ 251-264) ..................................................20

    Randall Roach (SoF ¶¶ 265-279) ..................................................20

**LEGAL STANDARDS** .............................................................................21

Summary Judgment Standards.............................................................21

Controlling Due Process Principles .....................................................22

The Role of Intent and of State Law....................................................23

**ARGUMENT**

I.    **UKH NEVER PROVIDED ADEQUATE NOTICE OF THE RIGHT TO
    A HEARING TO CONTEST THE EXISTENCE OR AMOUNT OF
    ALLEGED DEBTS SENT TO DOR FOR FORCED COLLECTION** .......................24

*Page*

A.   Defendants Have Conceded That Their Procedures Prior to
     June 2012 Did Not Comply With Due Process ........................   24

B.   Every Letter 8 Violated <u>Hamby v. Neel</u> Because It Did Not
     Tell Debtors That the Proffered Hearing Was the One and
     Only Chance to Avoid Asset Seizure .......................................   25

C.   Letter 8 Was Affirmatively Misleading in What It Did Say
     About Consequences ...............................................................   26

II.   **UKH VIOLATED DUE PROCESS BY PROHIBITING OR
      APPEARING TO PROHIBIT HEARINGS ON SOME OF THE MOST
      COMMON GROUNDS ON WHICH MEDICAL DEBTS ARE
      CONTESTED** ...............................................................................   27

A.   Because Quality-of-Care Issues Are Bases on Which to
     Adjust Medical Bills, the Failure to Offer or Hold Hearings
     on Such Issues Violated Due Process ......................................   28

B.   Letter 8's Denial of Hearings for "Inability to Pay" Was
     Misleading Because It Could Be Understood as Precluding
     Hearings on Wrongful Denials of Financial Assistance .........   29

C.   The Denial of Hearings for Inability to Pay Was
     Compounded By the Separate, Constitutionally
     Impermissible Denial of Notice and a Hearing at the Time
     Financial Assistance Is Denied ................................................   30

     1.   UKH's Financial Assistance Program Is an
          "Entitlement," and Denial Thus Triggers Due Process
          Protections ......................................................................   30

     2.   UKH Violated Due Process Because It Did Not Offer
          Patients a Hearing at the Time FAP Was Denied .........   31

III.  **LETTER 8 WAS NOT DELIVERED IN A "MEANINGFUL
      MANNER" AND THUS DID NOT SATISFY DUE PROCESS** .................   33

A.   Letter 8 Was Unlikely to Be Opened, Unlikely to Be Read if
     Opened, and Unlikely to Be Understood if Read ...................   33

B.   Letter 83 Did Not Solve the Notice Problem...........................   38

IV.   **THAT SOME PLAINTIFFS AND CLASS MEMBERS ENTERED
      INTO PAYMENT PLANS WITH DOR DID NOT VITIATE THE DUE
      PROCESS VIOLATION** ..................................................................   39

A.   Entry Into a Payment Plan Did Not Waive The Right to
     Notice and a Hearing .............................................................   39

B.   Plaintiffs' and Class Members' Entry Into Payment Plans
     Was Inherently Involuntary and Coerced ...............................   40

*Page*

**V.    THE APPROPRIATE RELIEF** ............................................................    42

    A.    Plaintiffs and the Class Are Entitled to Declaratory Relief
        that "Eradicates" the Ongoing Effects of Defendants' Due
        Process Violations ...................................................................    42

    B.    The Declaratory Relief Requested is Entirely Prospective
        and Thus Permissible Under the Eleventh Amendment .......................    44

    C.    Ancillary to the Declaratory Relief, Plaintiffs and the Class
        are Entitled to an Injunction Preventing UKH from Taking
        Unfair Advantage of Them in Any Future Collection Action ...............    45

**VI.    RELIEF IS APPROPRIATE AGAINST UKH AND KMSF** ...................................    46

    A.    UKH Is Liable for Causing the Deprivation of Class
        Members' Property Without Due Process. ...........................................    46

    B.    Relief Is Appropriate as to KMSF Debts ............................................    49

**CONCLUSION** ...........................................................................................    50

Certificate of Service ...........................................................................    51

TABLE OF AUTHORITIES

*Page*

**Cases**

*Adams v. Duncan*, 179 F.Supp.3d 632 (S.D.W.Va. 2016).................................... 43

*Alexander v. Machinists & Aerospace Workers*, 565 F.2d 1364 (6th Cir. 1977) ...... 42

*Armstrong v. Manzo*, 380 U.S. 545 (1965) .................................................. 2

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................... 46

*Baldwin v. Hale*, 68 U.S. 223 (1863) ........................................................ 2

*Board of Regents v. Roth*, 408 U.S. 564 (1972)............................................ 30

*Caterpillar Fin'l Servs. Corp. v. Sunnytime Seeding & Landscaping, LLC*, 2011 WL 4834242 (E.D.Ky. Oct. 12, 2011)................................................... 22

*Center for Food Safety v. Salazar*, 900 F.Supp.2d 1 (D.D.C. 2012) ........................ 43

*Chavez v. Northwest Collectors, Inc.*, 1985 WL 3085 (N.D.Ill. Oct. 11, 1985)........ 43

*Cleveland Branch, N.A.A.C.P v. City of Parma*, 263 F.3d 513 (6th Cir. 2001) ........ 42

*Connell v. Shoemaker*, 555 F.2d 483 (5th Cir. 1977) .................................... 43

*D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972) ................................... 40

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997)................................................................... 24

*ExYoung*, 209 U.S. 123 (1908) ................................................................ 1

*Fifth Third Bank v. Gentile*, 2009 WL 10688745 (N.D.Ohio Apr. 24, 2009) .......... 24

*Flatford v. Chater*, 93 F.3d 1296 (6th Cir. 1996) ........................................ 30

*Fuentes v. Shevin*, 407 U.S. 67 (1972)................................................... *passim*

*Garza v. Lansing School Dist.*, 972 F.3d 853 (6th Cir. 2020). ........................... 47

*Green v. Mansour*, 474 U.S. 64 (1986)...................................................... 45

*Greene v. Lindsey*, 456 U.S. 444 (1982).................................................... 22

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989).......................... 47

*Hamby v. Neel*, 368 F.3d 549 (6th Cir. 2004)............................................ *passim*

*Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786 (6th Cir. 2018)................................ 45, 46

*In re ClassicStar Mare Lease Litigation*, 727 F.3d 473 (6th Cir. 2013)................... 24

*Johnson v. City of Saginaw*, 980 F.3d 497 (6th Cir. 2020)................................ 2, 22

*Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001) ........................... 21

*King v. Zamiara*, 680 F.3d 686 (6th Cir. 2012) .......................................... 47

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (*en banc*)........................ 47

*Mathews v. Eldridge*, 424 U.S. 319 (1973)................................................. 22, 42

*Page*

*Memphis Light, Gas & Water Div'n v. Craft*, 436 U.S. 1 (1978) ............................. 29

*Midland Funding, LLC v. Johnson*, 137 S.Ct. 1407 (2017) ...................................... 45

*Milliken v. Bradley*, 433 U.S. 267 (1977) ...................................................... 42

*Montgomery v. Huntington Bank*, 346 F.3d 693 (6th Cir. 2003) .............................. 45

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306 (1950) ......................... 22, 33

*Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260 (9th Cir. 1998) ................................................................................................ 42, 43

*O'Neill v. City of Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723 (6th Cir. 2011) ................................................................................................. 23

*Olu-Cole v. E.L. Haynes Public Charter School*, 930 F.3d 519 (D.C.Cir. 2019) ...... 42

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ..................................... 33

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007), *cert. denied*, 555 U.S. 813 (2008) ............................................................ 47

*Quern v. Jordan*, 440 U.S. 332 (1979) ........................................................ 45

*Risner v. Regal Marine Indus.*, 2013 U.S.Dist. LEXIS 58690 (S.D.Ohio Apr. 24, 2013) ................................................................................................ 24

*United States v. Tingey*, 30 U.S. 115 (1831)................................................. 41

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................... 33

*Waskul v. Washtenaw Cty. Comm. Mental Health*, 979 F.3d 426 (6th Cir. 2020) .... 41

*Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 877 F.Supp. 634 (D.D.C. 1994).. 45

**Statutes**

15 U.S.C. § 1692e(11) .............................................................................. 7

15 U.S.C. § 1692f(8) ................................................................................ 13

15 U.S.C. § 1692g(a) ................................................................................ 7

42 U.S.C. § 1983 ..................................................................................... 46, 47

K.R.S. § 131.560 ...................................................................................... 27

K.R.S. § 131.570 ...................................................................................... 27

K.R.S. § 131.595 ...................................................................................... 27

KRS Chapter 13B ...................................................................................... 11

**Other Authorities**

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, available at https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf .................................. 34, 36

*Page*

**Rules**

Fed.R.Civ.P. 56(c) ............................................................... 21

Fed.R.Civ.P. 65(d)(2)(C) ........................................................ 49

**Treatises**

Restatement (Second) of Contracts § 175(1) ............................................. 41

**Regulations**

103 K.A.R. 1:070 § 2 ............................................................ 34

12 C.F.R. § 1006.26 ............................................................. 45

Plaintiffs and the Class respectfully submit this Memorandum of Law in support of their renewed motion for summary judgment against the UKH Defendants (Eli Capilouto and Penny Cox).[1] A portion of the relief that Plaintiffs and the Class sought in their original motion for summary judgment (the "Original MSJ": ECF##92, 93-2, 95-99, 101, as amended by ECF#102) has become moot, but other relief sought is *not* moot. This renewed motion seeks summary judgment in favor of Plaintiffs and the Class with respect to the portion of the relief sought that is not moot.

## INTRODUCTION

Discovery in this action confirmed that there was no genuine issue—indeed, no issue at all—as to the 15 years of due process violations committed by the Kentucky Department of Revenue (DoR) and the University of Kentucky Healthcare System (UK Healthcare or UKH). Until it was forced to give up the ghost in April 2022, DoR collected medical debts alleged to be owed by UKH's patients by *administrative* levy—that is, the state garnished Kentuckians' paychecks and seized their state tax refunds and funds from their bank accounts without any judicial intervention whatsoever. When patient-debtors disputed the existence or amount of the claimed debt, DoR did not offer them hearings of any kind, either before or after seizure. Indeed, it expressly denied that hearings were or could be available. DoR did all that at the behest, and for the benefit, of UKH.

---

[1] Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), the Defendants in this action are officials of the University of Kentucky who have charge of the University's healthcare system ("UKH") and officials of the Kentucky Department of Revenue ("DoR") who have charge of DoR's agency debt collections. As we did in our original motion for summary judgment (ECF#93-2, the "Original MSJ"), we refer to the institution rather than to the individual defendants. Saying "UKH" instead of "the University Defendants" and "DoR" instead of the "Department of Revenue Defendants" is both shorter and, in this context, more accurate. Although UKH's debt collection arm, Central Kentucky Management Services, Inc. ("CKMS") is occasionally referred to directly, all parties agree that CKMS is a component of UKH, and references to UKH are intended to include CKMS as appropriate.

Substantially all of the evidentiary material cited in this brief is in the record as part of the Original MSJ. Those materials were divided into four parts for ECF filing purposes (ECF##95, 96, 97, 98) and are headed by a Statement of Material Facts ("SoF") that keys into the specific evidence supporting specific factual assertions. As was the case in the Original MSJ, *all facts the Court needs to decide this motion are set forth in this brief*. Citation to SoF paragraphs (generally cited to ECF#95) is done as a shorthand and a convenience and should be understood as a citation to the specific evidentiary items referenced in those paragraphs.

Exhibits numbered 1 to 129 were submitted with the Original MSJ and may be found at ECF##95-98. Exhibits numbered 130 to 152 were submitted in opposition to Defendants' motions for summary judgment and may be found at ECF#108Additional evidentiary materials are annexed to this brief as Exhibits and are cited by Exhibit number, starting with Exhibit 153. Citations to depositions are to the excerpts previously submitted (ECF##99, 101, 108).

For more than 150 years, even before adoption of the Fourteenth Amendment, the law has

been clear that such conduct is inconsistent with fundamental fairness:

> Parties whose rights are to be affected are entitled to be heard; and in order that
> they may enjoy that right they must first be notified. Common justice requires that
> no man shall be condemned in his person or property without notice and an oppor-
> tunity to make his defence. *Baldwin v. Hale*, 68 U.S. 223, 233 (1863).

*Baldwin* embodies "the central meaning of procedural due process" under the Fourteenth Amend-

ment, so that:

> It is equally fundamental that the right to notice and an opportunity to be heard
> "must be granted at a meaningful time and in a meaningful manner." *Fuentes v.
> Shevin*, 407 U.S. 67, 80 (1972) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552
> (1965)); *accord Johnson v. City of Saginaw*, 980 F.3d 497, 507 (6th Cir. 2020).

None of that happened here.

Each of the Named Plaintiffs in this action has serious disputes about the existence or

amount of the medical debt Defendants have said they owe. Lucy Alexander, for example, was

told by UKH that her insurer had pre-authorized the procedure for which she was being billed;

UKH acknowledges that it made a coding mistake that caused the authorization to be rescinded,

but it strung Ms. Alexander along until it was too late to appeal the insurance denial. For years,

DoR collected from Ms. Alexander for a procedure she would not have had at all but for UKH's

mistake. And, in doing so, DoR took 20 cents of every dollar it collected from Ms. Alexander and

applied it to a statutory "fee" that it never could have collected but for the due process violation.

Ms. Alexander has never had a hearing on these issues. Instead, her bank account was

swept by DoR, her paycheck was garnished, and she was told that the only way she could avoid

continuation of such exactions was to enter into a payment plan for a debt she believes she does

not owe. As she testified (Alexander 74:3-14):

> I was told by the Department of Revenue that this is the only thing that I could do
> was make a payment plan. After they took a whole two week's paycheck, seized
> my wages. I went down to their office, and I sat down in front of two men, and they

> told me—I told them the whole story about the bill, how it was messed up, that they coded it wrong. The insurance paid, then they took it back. I told them the whole—went through everything with them. And they said, the only thing that you can do is make a payment plan. It was either that or them continuing [to] seize my wages. And I had two kids to take care of. That's what happened.

That, in a nutshell, is what this case is about.

Or, at least, that is what this case *was* about until last Spring. On March 24, a month after the parties filed their motions for summary judgment, DoR announced on its website that it was no longer in the business of collecting UKH medical debt:



https://revenue.ky.gov/Collections/Pages/Collection-Activity-Procedures.aspx (screenshot from visit on March 24, 2022).

***As it turns out, on the same day that Plaintiffs and the Class filed their Original MSJ***, DoR wrote to UKH throwing in the towel. As we now know, DoR told UKH that "the current statutory process is not the most efficient and effective method to collect [UKH] debt" (Ex. 153). Accordingly, DoR sought and obtained introduction of legislation in the General Assembly "to end the Departments role in these consumer debt collection matters" (*id.*). A month later, UKH gave notice to DoR terminating their collection agreement (Ex. 154). By taking this action in the

middle of summary judgment briefing, Defendants effectively conceded that they could not prevail on the merits of the constitutional claims in this action.

The Original MSJ sought two forms of relief:

- enjoining Defendants from continuing DoR's collection of UKH medical debt without affording Plaintiffs and the Class the due process they had been deprived of for over a decade, **and**

- prospective structural relief concerning the underlying debts, to ameliorate the ongoing effects of Defendants' 14-year regime of due process violations.[2]

The requested structural relief included, among other things, adjustments going forward of the balances due (or said to be due) to account for the 25% statutory "fee" that, in light of the due process violations, DoR never had any right to collect.

Defendants' abandonment of the DoR collection process—both the legislation sought by DoR and UKH's termination of the collection contract—became effective in April 2022.[3] At that point, the claim to enjoin ongoing DoR collections became moot. There were no more DoR collections, and (by statute) never would be. There was nothing at DoR left to enjoin.

The claim to enjoin ongoing collections by DoR was the only claim against the DoR Defendants (Thomas Miller and Tammy Watts). Accordingly, the action is fully moot as to them. But the claim against UKH has a second portion—the request for prospective structural relief—and that portion of the requested relief is *not* moot.

Although DoR has foresworn further collection activity, UKH has not. It apparently considered doing so at the time DoR collections ceased (*see* Ex. 155, a letter UKH drafted but, Plaintiffs believe, never sent), but it has not followed through. Accordingly, Plaintiffs and the Class Members face the possibility that UKH will sue them to collect the alleged debts. And it is in such

---

2    In the Amended Motion filed on March 9 (ECF#102), Plaintiffs and the Class removed one portion of the requested structural relief, but the Original MSJ was otherwise unchanged.

3    The language was added to the annual revenue bill, HB8, and the General Assembly overrode Gov. Beshear's veto on April 13, 2022. There is some question whether the legislation became effective immediately or only after a 90-day waiting period, but that issue is immaterial for current purposes.

lawsuits that Plaintiffs need protection from this Court against the ongoing, unabated consequences of Defendants' years of due process violations.

Specifically, Plaintiffs and the Class seek:

- a declaration that UKH must give them **full** credit against their alleged debt for **all** amounts they paid to DoR, regardless of how much DoR purported to allocate to the 25% "fee" that it never could have charged but for the due process violations;

- a declaration that UKH may not assert they conceded the validity of the alleged debt by bowing to DoR's coercion and entering into payment plans that purported to contain such a concession; and

- a declaration that, in defending UKH's suit, they may raise as a defense a wrongful denial of financial assistance.

This relief is entirely forward-looking. Plaintiffs and the Class seek not a dime returned of the amounts they have paid. If, as was once apparently contemplated, UKH chooses not to sue them, the relief will never bite. All that Plaintiffs and the Class seek is protection from the ongoing consequences of the years of due process violations in any collection action that UKH *does* pursue. And, as we now show, Plaintiffs and the Class are entitled to summary judgment granting them that forward-looking relief. The brief proceeds by first establishing the underlying due process violations and then showing the need for relief against the ongoing, residual effects of those violations.

## STATEMENT OF FACTS

### *The Three Stages of the Collection Process*

Prior to the recent termination of its relationship with DoR, UKH collected patient debts through a three-tiered process:

- collection attempts by UKH itself or by Kentucky Medical Services Foundation (KMSF),[4] the billing arm for UKH providers;

---

[4]   KMSF is the business office for providers practicing within the University of Kentucky HealthCare Enterprise.. As discussed below, it is ostensibly not part of the University of Kentucky but supposedly a separate non-profit foundation, which ultimately caused DoR to conclude that it did not have statutory authority to collect KMSF debt.

- referral for further collection attempts by Central Kentucky Management Services (CKMS)[5]; and

- referral to the Department of Revenue (DoR) for non-judicial collection remedies including wage garnishment, lien placement, state tax refund offset, and bank account levies.

In no stage did patients receive notice at a meaningful time and in a meaningful manner of their right to dispute the existence and/or amount of the debt.

The UKH collection process started when UKH or KMSF sent a form invoice to a patient showing the amount owed for medical services and procedures provided (SoF ¶ 6). Although the format of the invoices changed over the years, the substance did not. Since 2009, patient invoices from KMSF and UKH merely directed patients to call a customer service line with inquiries about the amount alleged to be owed and to memorialize any suspected billing errors in writing (SoF ¶ 8). **UKH's invoices have never contained notice about the patient's right to an appeal or a hearing on the existence and/or amount of the debt.** (SoF ¶ 7)

UKH policies did not direct staff to tell the patient about a right to a hearing or appeal; indeed, UKH customer service employees were trained not to use the word "hearing" *at all*. Instead, a patient's disputing a bill triged a completely internal review process within UKH, the result of which was simply communicated to the patient on take-it-or-leave-it basis (SoF ¶¶ 71-84).

Nor did UKH invoices advise patients that referral to CKMS would take away their right to financial assistance. UKH sent a series of four invoices, on identical forms but with increasingly urgent "pay now!" language in an optional-text box on the front. The third and fourth invoices (Forms C and X) warn the debtor to "pay immediately . . . to avoid placement with a collection

---

For purposes of this case, however, KMSF is a subsidiary of UKH, as the class definition (entered without opposition from UKH on this issue) expressly states.

[5]   CKMS is a non-for-profit corporation organized as a subsidiary of UKH and acts as a debt collector for UKH and KMSF debts.

agency" (SoF ¶¶ 9-10), but *none* of the invoices discloses that **placement with an agency cuts off the debtor's right to participate in UKH's Financial Assistance Program**—even through UKH agrees that this was precisely what happened on referral to CKMS (SoF ¶¶ 119-121).

After referral, CKMS sent initial notices that contained standard language from the Fair Debt Collection Practices Act (FDCPA) (*e.g.*, Ex. 5-7),[6] giving patients every reason to believe that UKH was employing ordinary collection practices that would ultimately result in a court process. The disclaimers remained substantially unchanged up until the end of UKH's relationship with DoR (SoF ¶ 15). The notices state that patients may notify CKMS that they dispute the validity of their debts, but they neither state nor imply that patients have the right to a hearing or appeal process before a neutral decisionmaker (SoF ¶ 16). And CKMS's written dispute policies, like those of UKH, described a completely internal review process for disputes, with no mention of "appeal" or "hearing." Once internal review was complete, CKMS advised the patient of the result and continued collection. Like UKH itself, CKMS never told patients who called to dispute their bills that they had a right to appeal. (SoF ¶¶ 71-84)

If CKMS did not succeed in obtaining payment, it referred outstanding patient debts to DoR, which (among other things) seized bank accounts and garnished wages to collect the debt.[7] The form notices issued by DoR never told UKH patients that they had a right to a hearing or appeal (SoF ¶¶ 98, 101), and it was DoR's firmly held and oft-restated position that no such right existed (SoF ¶¶ 102).

---

[6]   Under the FDCPA, a person who qualifies as a "debt collector" must disclose in the initial written communication "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). CKMS's initial notice parrots the language required by 15 U.S.C. § 1692g(a).

[7]   Prior to 2018 or 2019, DoR also placed liens on real property.

CKMS repeatedly sent DoR accounts containing errors (SoF ¶¶ 204-205 & Ex. 72). At least *324 individual accounts* were voided at the DoR level and sent back to CKMS due to UKH billing errors (SoF ¶ 183).

When a patient disputed their account with DoR, two responses often occurred: (1) DoR told the patient they could write a dispute letter, which DoR would forward to UKH; and (2) DoR put a time-limited hold on the account and sent it back to CKMS, triggering CKMS' internal review process (SoF ¶ 203). These responses could occur after property has already been seized (*e.g.*, SoF ¶ 199). There were also instances where CKMS did not respond to DoR, so when the time-limited hold expired, DoR would continue collecting on the account (SoF ¶ 203). Patients who requested hearings at the DoR level were simply told that was not an option (SoF ¶¶ 206-210).

### *The Saga of "Letter 8" and Defendants' Ongoing Effort To Prevent Hearings*

Starting in 2009, CKMS issued a document called "Letter 8" to patients prior to referring their alleged debts to DoR. Defendants' grudging, incremental changes to the document over the years tell a clear story of their repeated efforts to do as little as possible to provide hearings and as much as possible to prevent them.

#### *The First Letter 8*

The first Letter 8—used through May of 2012—merely states, "If we do not hear from you within 14 days from the date of this notice, your account will be turned over to the Commonwealth of Kentucky, Department of Revenue" (Ex. 12). This version of Letter 8 does not mention any right to a hearing or appeal.

*DoR's Cessation of Collections in 2012 Due to an Acknowledged Lack of Due Process, and Defendants' Decision to Keep Collecting "Pipeline" Debts Notwithstanding that Acknowledged Lack*

In the Spring of 2012, DoR realized that UKH's procedures did not provide due process, and DoR froze its collection activity on UKH accounts (SoF ¶ 34). In June, UKH put in place new procedures that, it claimed, would meet constitutional requirements (SoF ¶¶ 35-38), but Defendants still needed to decide what to do about the patient-debtors whose accounts were already with DoR—and thus, concededly, had *not* been afforded due process. Stephen Crawford, then an Assistant General Counsel at DoR, wrote to counsel for UKH as follows:

Harry,

We need to come to some consensus on how to address UK debts assigned to DOR for collection prior to the installation of your new procedures designed to satisfy the necessary elements of " due process" required by the 5ᵗʰ amendment. Your new procedures prospectively protect both of us from any serious challenge in the area of law. However, we have cases already " in the pipeline" at Revenue that would not meet the minimum standards of due process and the question becomes, what do we do with them? In a perfect world we could just send them back to you for implementation of your new procedures but this would dramatically reduce the amount of money we currently collect for UK. Many of these cases are already in voluntary pay agreements or subject to on going wage garnishments, should we disturb these types of arrangements because we believe minimum due process was not afforded in the beginning of the collection process? We need to think through the ramifications of what to do with this "pipeline" debt. I would like to propose a meeting in the near future to think through the pros and cons of possible solutions to this conundrum. Can you check your schedule for an opening in the near future?  Thanks!

(Ex. 15) No, it was not a "perfect world"—at least, the world inhabited by UKH and DoR was not. Rather than send the "pipeline" debt back to UKH so there could be some attempt to remedy the acknowledged failure of due process, DoR simply kept the money, kept the pipeline cases, and moved forward. As Defendant Watts testified:

Q   In fact, the cases were not sent back for implementation of the new procedures and they were kept, correct?

   A   Yes.

Q   Because there was a lot of money at stake, correct?

   A   Yes. (Watts 23:5-11).[8]

---
[8]   This was not the only instance where DoR and UKH decided not to submit refunds or make other adjustments upon concluding that their procedures had been faulty. In 2019 DoR concluded that it should no longer collect UKH's physician debt (as opposed to hospital debt) because that debt was through KMSF, which was **not** a state agency like the University itself (*see* Watts 29:10-30:21; 37:20-25). Initially, DoR decided it would not place new KMSF debt for collection but *would* keep collecting on existing payment plans and wage levies (*id*. 40:12-25).

-9-

### *The Subsequent Development of Letter 8*

In June 2012, in response to DoR's suspension of collection, CKMS added to Letter 8 a telephone number and contact person to call for an "independent review of your account" in the event of a dispute, but with no explanation as to what that review would entail (SoF ¶¶ 35-37). UKH sent this version of Letter 8 to "debtors with overdue UKH accounts" (SoF ¶ 38), at least 5,000 of them (Ex. 21). In all of 2012, only 93 people responded to 23,244 Letter 8s, and UKH conducted only 13 reviews (*id.* at 18-19).

In August 2012, a new version of Letter 8 stated that "under Kentucky law, you have the right to protest this bill and request a conference with a University of Kentucky, Hearing Officer," providing patients fourteen days to dispute their bill in writing (Ex. 19). The fourteen days ran from the date Letter 8 was *mailed* by CKMS, but the dispute documentation had to be *received* by CKMS within that time period—*i.e*, CKMS took the "mail float" on both ends of the process. Assuming (best case) two days for mail delivery on each end, UKH's patients had (at most) ten days to obtain a "conference" on medical bills that could be more money than they made in a year.

- In 2013, CKMS sent 14,210 Letter 8s. 19 reviews were requested; 6 were held.
- In 2014, CKMS sent 15,115 Letter 8s. 18 reviews were requested; 9 were held.
- In 2015, CKMS sent 7,083 Letter 8s. 11 reviews were requested; 1 was held. (SoF ¶¶ 45-47)

### *Defendant Watts Tells UKH and CKMS That Their Procedures Are Deficient*

On November 24, 2015, Defendant Watts (then Deputy Executive Director of DoR's Office of Processing and Enforcement) warned UKH and CKMS that their notice procedures violated Kentucky law because the initial invoice did not inform the debtor of their right to appeal (SoF

---

When all collection activity finally did cease, DoR did *not* make refunds to the individuals from whom, DoR believed, it had been collecting from without authority (*id.* 43:14-24). Plaintiff Baughman was one of the many individuals who suffered from this decision: DoR eventually stopped collecting the KMSF portion of her asserted debt, but it did *not* refund to her the money it had already taken (*id.* 44:10-25 & Ex. 113).

¶¶ 17-20). Ms. Watts provided sample corrective language for the invoices, which would have told UKH's patient-debtors that referral to DoR "may result in wage garnishments, bank levies, tax refund seizures or other collection actions" (Ex. 8). Ms. Watts made it clear that the changes were necessary before CKMS could validly certify debts to DoR as due and owing.

**Neither CKMS nor UKH *ever* modified their invoices based on this letter** (SoF ¶ 21), and **no document *ever* sent by UKH or CKMS warned patient-debtors of wage garnishments or bank levies**. Instead, UKH sought easier and cheaper solutions. In March 2016, Mr. Crawford and Marcy Deaton, a UK lawyer who wore a second hat as the UKH Hearing Officer (Deaton 30(b)(6) 96:13-21), exchanged emails regarding the use of "informal hearing" procedures, which might exempt UKH from the notice and hearing requirements of Kentucky's Administrative Hearings statute, KRS Chapter 13B. Crawford wrote, "This may be our way out!" and Deaton replied, "I like it!" (SoF ¶¶ 163) Ultimately, UKH concluded that the "way out" would not work and decided to outsource the few hearings it was holding to the Kentucky Attorney General's Office, a transition that took three years, from 2016 to 2019, to complete (Deaton 51:23-53:8). No hearings were conducted in this transition period, although some had been requested (*id*. 53:9-15). Until UKH turned the process over to the Attorney General's office in 2018, its "hearings" were held before Ms. Deaton, and did not even permit the patient to call or cross-examine witnesses from UKH (SoF ¶¶ 147-148). When the process moved to the Attorney General's office, Ms. Deaton took off one of her hats and slipped seamlessly into the role of prosecutor for UKH—which, in fact, is all she ever was.

### *The Final Letter 8 and Letter 83*

The December 2016 revision to Letter 8 gave patients thirty days instead of fourteen to dispute their bills; rephrased the patient's right to "protest" as a right to "dispute"; and renamed the patient's right to a "conference" as a "hearing" right (Ex. 25). Starting in 2018, and continuing

-11-

until Defendants gave up in 2022, Letter 8 did include some information for patients about the consequences of nonpayment of the debt, saying that "any individual state income tax refund to which you are entitled could be withheld for setoff against this debt. You would receive written notice before that occurs." (Ex. 24) But even this version was incomplete, for it did not mention the *additional* collection methods that DoR exercised, including wage garnishment and bank levy. *No* version of Letter 8 *ever* mentioned these collection methods.

The final version of Letter 8 also explicitly excluded certain types of disputes from the appeals process. Beginning in 2015, Letter 8 had contained the following proviso:

> NOTE: Hearings will not be granted on the grounds of inability to pay or dissatisfaction with medical care. (SoF ¶¶ 48-50)

This proviso was added to Letter 8 "to streamline the process" (Deaton 30(b)(6) 96:13-21)—*i.e.*, reduce the number of appeals UKH would have to deal with.

In March 2018, UKH amended its "Letter 83"—a "we haven't heard from you" letter that went out immediately before Letter 8—to contain hearing language similar to that in Letter 8 (including, in particular, the carve-out for inability to pay or dissatisfaction with medical care). (Deaton 30(b)(6) 116:22-117:5).[9] Letter 83 did not contain any reference to DoR or to actions DoR might take.

### The Timing of Letter 8, and Its Manner of Delivery

Despite the Kentucky law cited by Ms. Watts, which required information concerning appeals to be in the "initial invoice," UKH's initial invoice provided no such information. Indeed, as set forth above, UKH *never* provided such information. And CKMS's initial demand for payment was no more than a standard FDCPA request for verification, with no mention of appeals or

---

[9]   Exhibit 9 is the pre-2018 Letter 83 and Exhibit 10 is the post-2018 version.

hearings. (SoF ¶¶ 14-16) The supposed notice was provided only in Letter 8 and, from 2018 to 2022, Letter 83.

Letters 8 and 83 did not come at the beginning of the process but rather at the end (*see* Ex. 9). For example, CKMS sent Plaintiff Metts *thirty-two separate validation letters* before they sent him Letter 8 (ECF #32-43). The timing of Letter 8's delivery concealed its importance.

So did the manner of its delivery. CKMS is a debt collector and must comply with the FDCPA (SoF ¶ 12). Because section 1692f(8) of the FDCPA generally prohibits anything but a return address on an envelope sent for debt collection purposes, Letter 8, like all CKMS correspondence, arrived in a plain envelope, with no indication that it was from a debt collector, let alone that it contained important information about legal rights that would be forever lost unless exercised immediately (SoF ¶ 60). The undisputed expert testimony is that it was "unlikely that [Letter 8] would be opened; if opened, unlikely the 'hearing' section would be read; and if read, unlikely the 'hearing' section would be comprehended."

CKMS records show that it mailed Letter 8 to Named Plaintiffs, but Named Plaintiffs do not recall receiving it, nor did they retain it, though they retained other correspondence from UKH and CKMS. If they received Letter 8, they did not recognize its importance at the time (*e.g.*, SoF ¶¶ 239, 275). This was a natural consequence of Defendants' conduct.

Defendants' statistics on the response to Letter 8—63,000 sent, 65 hearings requested, a response rate of *one-tenth of one percent*—confirm its insufficiency as a vehicle for providing actual notice of due process rights to UKH patients. There were 4,000 disputes in UKH's "Complaint Tracker" spreadsheet from January 1, 2017 through 2020 (SoF ¶ 66).[10] In that time period there was precisely *one* hearing held (*id.*). Suppression works.

---

[10]   The spreadsheet was produced during class discovery in 2020 and thus does not contain information for subsequent periods.

*DoR Collection Procedures After Referral to DoR*

Several aspects of DoR's collection procedures following referral remain relevant, not-withstanding the DoR's termination of further collection activity, because they effected permanent changes in the parties' relationships. Assuming Plaintiffs and the Class prevail on the underlying constitutional claim, they are entitled to declaratory relief against those ongoing effects.

*The 25% Fee*

Pursuant to K.R.S.§ 45.238(3)(a)(2) and K.R.S.§ 45.241(7)(b)(1)(b), DoR added a 25% "collection fee" to the principal amount of every debt UKH referred to it for collection. As a consequence, payments made to DoR by UKH medical debtors *did not* reduce the amount of the debt dollar-for-dollar. Rather, only 80% of each payment went to reduce the outstanding principal amount; the rest was retained by DoR. As DoR stated in response to a request for admission:

> When medical debts are referred to the Department, a cost of collection fee of 25% are added to them. The Department remits 80% of all amounts collected to the University of Kentucky, and retains 20%, until the 25% collection fee has been collected. Thereafter, the Department remits 100% of any remaining amounts to the University. (Ex. 156)

No version of Letter 8 ever told debtors that sending their debt to DoR would make them subject to this additional fee.

A statement sent by DoR to Plaintiff Alexander just before this action was filed (Ex. 157) shows how this "collection fee" worked. The principal amount of the "referred debt liability" was shown as $25,340.93, to which had been added a 25% "Enterprise Cost of Collection" fee of $6,335.23.[11] The first two payments (on pages Plaintiff_Class_000023-24), which were a tax refund offset and the wage garnishment, totaled $3,944.19 ($2,012.00 + $1,922.19), of which

---

[11] Interest of $5,091.98 was also shown as added, but UKH does not charge interest on its medical bills (the interest shown is statutory interest pursuant to K.R.S.§ 45.241(7)(b)(1)(a)), and counsel for Defendants have asserted that the accounts "returned" to UKH when DoR ceased collections in April 2022 did not include interest. Assuming this is correct—but UKH will need to confirm that it is—then relief is not necessary as to interest.

$786.83 ($402.40 + $384.43) was allocated to the fee and thus did not reduce the outstanding principal balance. Thereafter, Ms. Alexander entered into a payment plan of $100 every two weeks, and $20 of each payment was allocated to the fee (pages Plaintiff_Class_000024-31). All told, Ms. Alexander paid DoR $20,191.45, but over $4,000 of that was allocated to the fee. Including interest, her balance due at the end of the period had been reduced by less than $9,000, to $16,576.69.

On this motion, Ms. Alexander asks that, going forward, she be given full credit against her debt for the $20,191.45 she has already paid, so that if UKH sues her on the alleged debt, the most it can seek, even if it wins on the merits, is $5,149.48. Plaintiffs and the Class seek similar relief on behalf of every member of the Class who made any payments at all to DoR.

### *The Coerced Payment Plans*

Like Ms. Alexander, many Class members entered into payment plans with DoR once they understood that (a) DoR could grab their assets and (b) they had no escape, because there was no right to a hearing at DoR. Throughout this litigation, Defendants have asserted that any due process claim by such Class members was vitiated by their "voluntary" act of entering into a payment plan. But entry into payment plans by Plaintiffs and Class Members was ***not*** voluntary; it was coerced. It was inherently ***involuntary***.

The first communication a debtor got from DoR was a notice telling them their assets were subject to seizure if they did not immediately pay the asserted debt in full.  Thus, on January 5, 2015, Plaintiff Alexander was sent a letter (Ex. 35) as follows:

> **RE: Delinquent Debt**
>
> Pursuant to KRS 131.020(1)(c)(2), and where applicable KRS 134.547, your debt totaling $31,830.29 has been referred to the Department of Revenue for collection. If this debt is not paid within 10 days, the following administrative collection actions may be taken to collect the due and owing debt:
>
> Seizure may be made on all property or rights to property, both real and personal.  This includes, but is not limited to, the attachment of any funds held by a bank on your behalf, any wages paid to you by your employer, and the seizure and sale of any real estate you may own.
>
> A Notice of State Lien may be filed with your County Clerk.  This lien will encumber all real and personal property you now own or may acquire in the future.  It should be understood that the filing of a lien may be reflected in credit records maintained by various credit bureaus.
>
> Any tax refund or other monies that may become due to you from the Commonwealth may be offset to your outstanding debt.
>
> To avoid these collection actions, payment in full must be submitted within 10 days. Any payments by

The letter does not mention payment plans, but when patients called DoR they were told a payment plan was their only way to avoid either paying in full immediately or having their assets seized (SoF ¶¶ 96-100). This initial letter was followed up by a "Final Notice Before Seizure" (*e.g.*, Ex. 36), which said basically the same thing, only in solid capital letters. DoR said that patients who disagreed with the bill could submit their reasons to DoR, but DoR made it clear that *it* would decide whether those reasons were valid. No right of appeal was mentioned, and none was given.

Defendant Watts testified that entry into a payment plan in these circumstances is "voluntary":

> A   . . . [W]hen when they voluntarily entered into a pay agreement, we assume they accept the debt and think it's correct and are making payments on it.
>
> Q   Okay.   So you're placing a lot of weight on the word "voluntarily" there, aren't you?
>
> A   Voluntarily. They volunteer to pay.
>
> Q   Of their own free will with no -- with – with no impetus from the Department?
>
> A   We don't twist their arm. (Watts 52:4-12)

"Don't twist their arm"? Nonsense. Look at those letters. And remember that anyone who asked was told that there were three and only three choices: pay in full, do a payment plan, or have your assets seized.

Thus, in 2019, Plaintiff Tip Moody entered into a payment plan with DoR after discovering DoR had placed a lien on his 90-year-old mother's home in 2010 (SoF ¶¶ 261-262).  Similarly, on June 18, 2015, DoR seized Plaintiff Lucy Alexander's entire biweekly paycheck. Ms. Alexander had two children to take care of and was depending on this money. After calling her employer's HR office to find out what happened, she drove straight to DoR's office to ask for a meeting (Alexander 74:5-14). At DoR's office, three men met with Alexander, and she told them about her dispute with UKH. They told her that she had to enter a payment plan of at least $100 every two weeks or they would continue to garnish her wages. So, Alexander started to pay $200 a month to DoR, which DoR took out of her paycheck directly. Plaintiffs Baughman and Moody likewise entered into a payment plan with DoR because they felt they had no choice (SoF ¶¶ 262, 295).

*Named Plaintiffs' Facts*[12]

### Lucy Alexander (SoF ¶¶ 216-250)

Ms. Alexander started planning for her 2012 hernia repair surgery, an elective procedure, two months in advance, which included paying a $150 preauthorization fee. Before the surgery, UKH told Ms. Alexander that her insurer, Anthem, had preauthorized the surgery and it would be fully covered. After the procedure, however, Ms. Alexander received a letter from Anthem denying coverage. Ms. Alexander immediately contacted UKH to express her confusion and was told they would look into it. Ms. Alexander did not hear from UKH until three months later when she received a bill indicating that Anthem *had* covered the procedure. Ms. Alexander called UKH to set up a payment plan for the remaining balance three separate times but was always told the claim was still pending with her insurance, so she should wait. Then seven months after receiving that initial bill from UKH, Ms. Alexander received a bill now showing that she owed the full cost of

---

[12] Plaintiff Danny Metts was unable to sit for his deposition, and UKH moved to dismiss him as a Plaintiff (ECF #91). Plaintiffs proposed deferring dismissal until closer to trial, but in the current circumstances Plaintiffs and the Class are not in a position to oppose the motion to dismiss Mr. Metts.

the procedure, more than $25,000. Through calling UKH's billing department, Ms. Alexander now discovered that UKH had miscoded the procedure and her insurance company would *not* cover the surgery.

By then, however, Ms. Alexander's time to appeal her insurer's decision had lapsed. UKH told Ms. Alexander that her only recourse was to file an insurance appeal that they themselves had rendered untimely. To dispute this, Ms. Alexander and her husband called UKH's phone number dozens of times and Ms. Alexander even emailed UKH a dispute letter. UKH's internal records indicate that the employees with whom Ms. Alexander spoke understood that she disputed the amount of the debt.

In December 2013, a UKH employee unilaterally removed the dispute indicator from Ms. Alexander's account and in January placed her account for collection with CKMS. Ms. Alexander does not remember receiving any mail from CKMS; her only contact with them was over the phone, when CKMS called her. Ms. Alexander reiterated her dispute to CKMS employees but was always told her only option was to pay. Over the phone, CKMS employees never told Ms. Alexander her account was being transferred to DoR, even when asked about consequences of non-payment.

Ms. Alexander discovered DoR's collection powers when it garnished 100% of her bi-weekly paycheck. Before the garnishment, she believed her bill was not in active collection because of her ongoing dispute with UKH. Fearful of continuing garnishment, Ms. Alexander succumbed to DoR's demands to enter a payment plan.

Ms. Alexander never knew she had the right to a hearing on her dispute. If she had known of such a right, she would have exercised it.

### *Mary (Margaret) Baughman (SoF ¶¶ 280-304)*

In 2011, Mary Baughman, then age 60, received an echocardiogram, an endoscopy, and a colonoscopy from UKH providers. At the time, Ms. Baughman was disabled, uninsured, and un-employed. When her doctor recommended that she follow up the colonoscopy with a CT scan of her abdomen, Ms. Baughman explained that she was uninsured and inquired about the cost and necessity of the procedure. The provider did not give Ms. Baughman a cost figure but insisted she should have the procedure and that it wouldn't be that much money; Ms. Baughman followed her doctor's advice and consented to the scan. The CT scan was negative for abnormalities, but Ms. Baughman discovered that she now owed UKH nearly $3,000 for the procedure.

UKH's internal records show that after Ms. Baughman received the initial invoices, she communicated with UKH on several occasions about the Financial Assistance Program (FAP). The records also show that UKH knew that Ms. Baughman was disabled, uninsured, and unem-ployed at the time that she received the services at issue. And the records demonstrate that based on Ms. Baughman's FAP application, UKH believed that she qualified for the program. Neverthe-less, UKH failed to apply the FAP discount to the charges, and the debt was eventually referred to CKMS for collection. Ms. Baughman received no notice that she thereby lost her right to Financial Assistance.

When she began receiving threatening notices from DoR, Ms. Baughman contacted DoR to set up a payment plan but also put DoR on notice about her inability to pay the full amount. She also complained to DoR about being charged for an expensive and unnecessary procedure. DoR's records show that DoR understood Ms. Baughman was disputing the debt.  But DoR never gave Ms. Baughman any indication that she had a right to a hearing or an appeal; instead, they advised her that her only recourse was to send them a dispute letter that they would forward on to UKH.

Ms. Baughman never knew she had the right to a hearing on her dispute. If she had known of such a right, she would have exercised it.

### Robert Moody (SoF ¶¶ 251-264)

Robert Moody had received treatment at UKH since his HIV diagnosis in 2001. Over the last two decades, most of Mr. Moody's treatment has been covered by federal funds from the Ryan White HIV/AIDS program and UK's FAP. Mr. Moody qualified for and received FAP from 2001 to 2007; he also qualified for FAP from 2008 to 2009, but UKH failed to provide a renewal application in early 2008. In 2008, Mr. Moody realized he was no longer covered by FAP when he started receiving bills reflecting thousands of dollars in charges. It was not until September 15, 2008 that UKH told Mr. Moody that he had needed to reapply for FAP as of January 1.

While Mr. Moody was still cooperating with UKH's FAP application process and disputing the charges with CKMS, UKH referred his debt to DoR for collection—without granting the FAP discount or issuing a FAP denial notice. Mr. Moody notified DoR about his dispute and managed to trigger CKMS's internal review process on several occasions.  However, as the Defendants' internal review policies contemplate, internal reviews always resulted in continuing collection. In 2019, in order to get DoR to release a lien against his mother's home, Mr. Moody was forced to enter a payment agreement with DoR on the 2008 debts.

Mr. Moody never knew he had the right to a hearing on his dispute. If he had known of such a right, he would have exercised it.

### Randall Roach (SoF ¶¶ 265-279)

Randall Roach had surgery and was hospitalized for three days at UKH after a shooting range accident in early 2019. Mr. Roach was uninsured at the time of the accident. He recalls filling out an FAP application during the hospitalization and a UKH employee telling him that he qualified for the program and would not have to pay for the services he was receiving.

-20-

UKH's internal records support Mr. Roach's recollection. After establishing that Mr. Roach would not qualify for Medicaid or the Medicaid spend-down program, the records show that he signed a FAP application and was advised to return his 2018 W-2 Form and proof of income for 2019. Mr. Roach provided his 2018 W-2 Form as instructed and even checked in on his application during a follow-up appointment. Mr. Roach was told by two different UKH employees that he would be covered by FAP and had no unpaid bills. But, without notifying Mr. Roach, UKH denied his FAP application and referred his debt to CKMS for further collection, cutting off his ability to appeal the FAP denial.

Mr. Roach first learned that he owed UKH for the 2019 hospital stay when he received a bill from DoR for more than $73,000.00, which included interest and a $14,000+ DoR collection fee. When he contacted UKH about the DoR notice, the UK employee with whom he spoke told him for the first time that his FAP application had been denied and then advised him to "contact [the] collectors" even though the "collectors" (CKMS) could not and would not help him.

Mr. Roach never knew he had a right to a hearing on his dispute. If he had known of such a right, he would have exercised it.

## LEGAL STANDARDS

### Summary Judgment Standards

A party is entitled to summary judgment when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001); Fed.R.Civ.P. 56(c). When determining a summary judgment motion, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Williams v. Int'l Paper Co.*, 227 F. 3d 706, 710 (6th Cir. 2000). Nevertheless, "[t]he moving party need not support its motion with evidence disproving the nonmoving party's

claim, but need only show that there is an absence of evidence to support the nonmoving party's

case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

To defeat summary judgment, an asserted issue of fact must, in the language of the rule, be

"genuine." As this Court has held:

> A genuine dispute exists on a material fact, and thus summary judgment is im-
> proper, if the evidence shows that a reasonable jury could return a verdict for the
> nonmoving party. Stated otherwise, [t]he mere existence of a scintilla of evidence
> in support of the [nonmoving party]'s position will be insufficient; there must be
> evidence on which the jury could reasonably find for the [nonmoving party]. *Cat-
> erpillar Fin'l Servs. Corp. v. Sunnytime Seeding & Landscaping, LLC*, 2011 WL
> 4834242, at *1 (E.D.Ky. Oct. 12, 2011) (citations and internal quotation marks
> omitted).

### Controlling Due Process Principles

The Sixth Circuit enunciated the principle at the core of this case in *Hamby v. Neel*:

> It is well established that a possessory interest in property invokes procedural due
> process, which would require adequate notice and a meaningful hearing prior to
> any attempt to deprive the interest holder of that right. 368 F.3d at 560

And "[i]t is equally fundamental that the right to notice and an opportunity to be heard 'must be

granted at a meaningful time and in a meaningful manner.'" *Fuentes*, 407 U.S. at 80; *accord John-

son v. City of Saginaw*, 980 F.3d at 507. In declaring unconstitutional the notice provided ro Ken-

tuckians facing eviction, the Supreme Court held:

> [When] arriving at the constitutional assessment, we look to the realities of the case
> before us: In determining the constitutionality of a procedure established by the
> State to provide notice in a particular class of cases, "its effect must be judged in
> the light of its practical application to the affairs of men as they are ordinarily con-
> ducted." *Greene v. Lindsey*, 456 U.S. 444, 451 (1982) (citation omitted).

Any procedures the government uses "must be tailored, in light of the decision to be made,

to 'the capacities and circumstances of those who are to be heard.'" *Mathews v. Eldridge*, 424 U.S.

319, 349 (1973). This is not a matter of form but of substance: "When notice is a person's due,

process which is a mere gesture is not due process." *Mullane* 339 U.S. at 315. The Constitution

-22-

requires notice that someone "desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id*.

In this case, UKH's patient-debtors had two distinct property interests at stake at two separate moments in the Defendants' collection processes. Ultimately, the property at stake for Plaintiffs and the Class was the property DoR was able to seize, intercept, garnish, and encumber—Plaintiffs' wages, state tax refunds, money in bank accounts, and real property. But Plaintiffs and the Class also had a "legitimate claim of entitlement" to the financial assistance available through UKH's charitable care program, the Financial Assistance Program, discussed in Point II.C below. Defendants' deprivation of each of these property interests throughout the 2009-2022 period triggered due process protection.

### The Role of Intent and of State Law

A defendant's intent is not an element of a procedural due process claim, and it is not here. A hearing either is or is not offered on the matters on which it must be offered; notice either is or is not adequate to apprise the person whose property is at risk of the right to contest the impending seizure. Likewise, a violation of state law relating to notice does not automatically create a due process violation. As set forth in detail below, a straightforward application of objective criteria to undisputed (or indisputable) facts shows that Defendants' conduct here violated due process as a matter of federal constitutional law.

But that does not mean that intent and state law are wholly irrelevant in this case. The state laws and regulations, for example, reflect the considered judgment of the Commonwealth of Kentucky as to what constituted providing "adequate information" to the debtor, and they can therefore be considered in evaluating whether, under all the circumstances, the notice was in fact sufficient. *See*, *e.g.*, *O'Neill v. City of Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 734 (6th Cir. 2011) (notice "lacked all the elements required by [state law] . . . and was not reasonably calculated

to apprise the O'Neills of the allegations against them or of the procedures available to present their objections"). Furthermore, intent can shed light on consequences. Just as a defendant's purpose to deceive bears on whether statements are misleading, *Risner v. Regal Marine Indus.*, 2013 U.S.Dist. LEXIS 58690, at *46-47 (S.D.Ohio Apr. 24, 2013), and just as a trademark defendant's intent to cause confusion bears on the likelihood that confusion will ensue, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997), these Defendants' clear intent not to let messy things like due process get in the way of their collection juggernaut reinforces the objective determination, on the face of Defendants' documents and procedures, that due process was, in fact, not satisfied.

Plaintiffs and the Class reiterate that they are entitled to summary judgment without considering issues of intent or issues of state law. But the evidence is there, it all goes in one direction,[13] and the Court may consider such evidence both for context and to resolve any doubts the Court may have on the dispositive federal issues.

ARGUMENT

**I.   UKH NEVER PROVIDED ADEQUATE NOTICE OF THE RIGHT TO A HEARING TO CONTEST THE EXISTENCE OR AMOUNT OF ALLEGED DEBTS SENT TO DOR FOR FORCED COLLECTION**

**A.   *Defendants Have Conceded That Their Procedures Prior to June 2012 Did Not Comply With Due Process***

It is indisputable that Defendants' procedures prior to June 2012 did not satisfy due process. The DoR *never* provided notice and a hearing, and in that timeframe **neither did UKH.** Mr. Crawford's June 5, 2012 e-mail expressly acknowledged that due process had not been given up to that

---

[13]   Because intent is not an element of the due process claim, issues of fact as to Defendants' intent (if any exist) would not preclude entry of summary judgment for Plaintiffs and the Class. It bears mentioning, however, that summary judgment on issues of intent, although rare, *is* appropriate where (as here), the evidence reflects an absence of a genuine dispute on the issue. *E.g.*, *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 484-87 (6th Cir. 2013) (affirming summary judgment for plaintiffs on RICO claim; "the district court properly found that Defendants could not establish a genuine dispute regarding their intent to defraud"); *Fifth Third Bank v. Gentile*, 2009 WL 10688745, at *6 (N.D.Ohio Apr. 24, 2009) (granting summary judgment to plaintiff on "actual intent to defraud" fraudulent conveyance claim).

point. Accordingly, the Class is entitled to summary judgment with respect to any debts sent to DoR for collection prior to June 2012.

> **B.**     ***Every Letter 8 Violated <u>Hamby v. Neel</u> Because It Did Not Tell Debtors That the Proffered Hearing Was the One and Only Chance to Avoid Asset Seizure***

No version of Letter 8 ever warned debtors that if they do not appeal *now* their assets will be subject to administrative levy without any right to a hearing whatsoever. A debtor would ordinarily expect (and Plaintiff Moody did expect (Cplt. ¶ 141; *see* ECF #32-6 ¶ 1)) that a creditor could not seize assets without first suing and obtaining a judgment. The debtor would further expect that s/he could, in that lawsuit, raise any defenses to the existence or amount of the debt that s/he had. As UKH's 30(b)(6) witness admitted, ***no version of Letter 8 ever told debtors that if they do not appeal <u>now</u> they will forever forfeit the right to contest the debt*** (Deaton 30(b)(6) 124:17-125:5)*.* This failure is fatal to Defendants' claims that they complied with due process and, by itself, established the underlying due process violation that is the predicate for the forward-looking structural relief sought by this motion.

In *Hamby v. Neel*, Medicaid applicants received denial letters that did not inform them, *inter alia*, that:

> [I]f an appeal of a denied application was not pursued, applicants would be barred from a claim of benefits originating from the date of their initial applications; and . . . if applicants did submit new applications with new insurance denial letters, the second claim would cut off eligibility based on the first applications.

368 F.3d at 560. The Sixth Circuit held that because "the denial notices did not advise the applicants of the consequences of not appealing and filing new applications," the "Plaintiffs were given constitutionally inadequate notices in violation of procedural due process." *Id.* at 561-62.

*Hamby* is directly on point and controlling here. UKH patients were entitled to be told "the consequences of not appealing"—*i.e.*, that the hearing offered in Letter 8 was the one and only

chance they would *ever* have to contest the existence or amount of the alleged debt. They were

not. Accordingly, Plaintiffs and the Class here "were given constitutionally inadequate notices in

violation of procedural due process," and summary judgment on the issue of the underlying due

process violation should be entered in their favor.

> **C.    *Letter 8 Was Affirmatively Misleading in What
> It Did Say About Consequences***

In December 2018, Letter 8 was revised to include some information regarding the conse-

quences of nonpayment of the debt and the possible means to enforce it. A proviso was added

stating "any individual state income tax refund to which you are entitled could be withheld for

setoff against this debt. You would receive written notice before that occurs." (SoF ¶ 51) For sev-

eral reasons, this addition was affirmatively misleading.

First, notwithstanding Defendant Watts's express admonition in November 2015, no ver-

sion of Letter 8 mentioned the *additional* collection methods that DoR exercises against the patient,

including wage garnishment and bank levy.[14] That omission, particularly in combination with the

affirmative mention of tax refund offsets, made all versions of Letter 8 after December 2018 af-

firmatively misleading. People who were not expecting state tax refunds would think they had

nothing to fear, and they would be very, very wrong.

Second, the statement that "[y]ou would receive written notice before [tax offset] occurs"

was, at best, misleading. DoR told debtors that their tax returns "may be" seized (Ex. 35), but as

Defendant Watts admitted, it never told them when seizure was about to happen (Watts 111:20-

112:6).

---

[14]   Neither UKH nor CKMS *ever* incorporated *any* warnings about garnishments or bank levies in *any* of their corre-
spondence with UKH patients.

Third, the statement in Letter 8 implied patients could do something to protect themselves as a consequence of that "written notice," whereas under Defendants' scheme they could not. *There were no hearings at the DoR level,* and none at *any* level once a matter had been referred to DoR.

Finally, the reference to "written notice" was additionally misleading because patients who investigated the regulations governing these procedures would learn that under K.R.S. § 131.570, they were not merely entitled to notice before offset of a tax refund; they were *also* entitled to a *hearing before the claimant agency* (here, UKH) to contest the debt to which the offset is applied. The patient would likewise learn that under K.R.S. § 131.595, the procedures set forth in K.R.S. § 131.560 to .595, including the notice/hearing procedure set forth in K.R.S. § 131.570, are the *exclusive* vehicle for applying state tax refunds to agency debts (Watts 111:16-113:21). A patient who drew that conclusion, however, would be bitterly disappointed, because DoR was taking the convoluted position (Ex. 129) that a statute that has never been repealed, and states it is exclusive, does not apply to the precise subject matter it addresses. Whether DoR's verbal gymnastics could, if challenged, survive as a matter of Kentucky law does not matter from a due process standpoint. What matters is that, since December 2018, UKH's Letter 8 said things that were not true and that would lead a patient/debtors to believe they had remedies that DoR did not in fact provide.

## II.   UKH VIOLATED DUE PROCESS BY PROHIBITING OR APPEARING TO PROHIBIT HEARINGS ON SOME OF THE MOST COMMON GROUNDS ON WHICH MEDICAL DEBTS ARE CONTESTED

The scope of the hearings UKH was required to hold to comply with due process is not a matter of dispute. UKH's Rule 30(b)(6) witness testified as follows:

> Q   With respect to your authority [as UK's Hearing Officer], you under-stood, did you not, that a debtor could raise anything in the hearing that they might defend [a]n action on the debt for?
>
>    A   Correct. (Deaton 30(b)(6) 67:22-68:1)

-27-

As noted above, however, since 2015 Letter 8 contained the following proviso:

> NOTE: Hearings will not be granted on the grounds of inability to pay or dissatisfaction with medical care. (Ex. 23 (2015); Ex. 24 (current))

For two separate reasons, that proviso denied Class Members due process.

### A.   Because Quality-of-Care Issues Are Bases on Which to Adjust Medical Bills, the Failure to Offer or Hold Hearings on Such Issues Violated Due Process

UKH's refusal to provide hearings on one of the most fundamental, most commonly contested issues relating to medical bills—complaints about the quality of the care for which the patient was billed—was both a failure of notice[15] and a separate basis on which Class Members who were denied a hearing on care issues suffered a taking of their property without due process.[16]

It is *stipulated* that care issues can be bases on which to obtain adjustment of a medical bill. UKH's Risk Management Department routinely considered and acted on such requests:

- Christie Young, R.N., reviewed cases referred by billing or Customer Service (including, where applicable, by CKMS) that raised care issues in connection with a billing, and she relayed her findings to the Director of Risk Management, Margaret Pisacano, who made decisions on behalf of the University of Kentucky as to whether to make a "risk management adjustment" to a patient bill.

- Sometimes Ms. Young, at the direction of the Director of Risk Management, instructed billing to make such an adjustment, and sometimes she did not.

- Ms. Young had authority to decline to recommend a risk management adjustment without referring the matter to Ms. Pisacano when Ms. Young determined that a risk management review was not warranted, and she did so on a number of occasions.

- The basis for Risk Management's decision in each instance was whether it believed the referred matter implicated a patient care issue, and if so, its assessment of the patient care issue in that case. (Ex. 67)

So far, this was not necessarily a due process problem. But it is also stipulated that:

---

[15]   That is, Letter 8 states that hearing will not be given when, in fact, a hearing is constitutionally required.

[16]   That there *are* such Class Members is clear. (SoF ¶ 174)

- For billing purposes, Risk Management's decision concerning whether to instruct billing to make a risk management adjustment was final and, in UKH's view, was not subject to review by appeal/hearing. (*Id.*)

That *was* a due process problem—indeed, a flat-out due process violation. It was not for UKH to make unilateral decisions as to what issues "deserve" a hearing. As the Supreme Court held in *Fuentes*:

> If it were shown at a hearing that the appellants had defaulted on their contractual obligations, it might well be that the sellers of the goods would be entitled to repossession. But even assuming that the appellants had fallen behind in their installment payments, and that they had no other valid defenses, that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. "To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession. 407 U.S. at 87 (quoting *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424 (1915)).

Because Letter 8 denied the right to a hearing where one was constitutionally required, it was not adequate notice for due process purposes.

### B. *Letter 8's Denial of Hearings for "Inability to Pay" Was Misleading Because It Could Be Understood as Precluding Hearings on Wrongful Denials of Financial Assistance*

Although UKH nominally did permit hearings contesting a medical bill on the basis of wrongful denial of financial assistance, and on at least some occasions recognized that claims for wrongful denial were appropriate subjects for such a hearing,[17] Letter 8 is couched in terms that appear to deny such right. The single most likely person who will have an "inability to pay" a medical bill is one who was eligible for financial assistance but, for some reason, did not receive

---

[17]   There are several examples of such hearings in the record (SoF ¶¶ 150-154). Even here, however, UKH has admitted that it frequently refused to permit a hearing when—in its own, unilateral determination—it concluded that the denial of financial assistance was correct. (Deaton 30(b)(6) 96:22-98:3) Under *Fuentes*, that violated due process.

it. Such a person, when told s/he has no right to hearing on "inability to pay," could easily conclude that s/he was barred from asserting that the inability was due to a wrongful denial of financial assistance. Notices that do not adequately describe the remedies available to the person whose property is being taken do not satisfy due process. *Memphis Light, Gas & Water Div'n v. Craft*, 436 U.S. 1, 13-16 (1978). Here, the notice affirmatively *misdescribed* the remedy by denying the possibility of a hearing when one was at least potentially (and constitutionally must have been) available.

### C.   *The Denial of Hearings for Inability to Pay Was Compounded By the Separate, Constitutionally Impermissible Denial of Notice and a Hearing at the Time Financial Assistance Is Denied*

#### 1.   **UKH's Financial Assistance Program Is an "Entitlement," and Denial Thus Triggers Due Process Protections**

The threshold question in *Hamby v. Neel* was whether those plaintiffs had a "legitimate claim of entitlement" with respect to Tennessee's Medicaid program (Tenncare) "such that due process requirements are invoked." Quoting *Board of Regents v. Roth*, 408 U.S. 564 (1972), the *Hamby* court recognized:

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. 368 F.3d at 557.

A person need not be already receiving benefits to have a property interest protected by the Fourteenth Amendment. "[T]his Court has previously held that a social security claimant has a property interest in benefits for which he or she hopes to qualify." *Id.* at 559 (citing *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996)). That is, states must use fundamentally fair processes when determining a person's *eligibility* for a benefit.

The financial assistance available to UKH's patients under its Financial Assistance Program is an entitlement, not a mere unilateral expectation. The program is operated on an integrated basis with the Medicaid Disproportionate Share Hospital ("DSH") program (SoF ¶¶ 128-131), and the program's policies and procedures are "existing rules" from "an independent source . . . that secure certain benefits and that support claims of entitlement to those benefits." *Roth* at 576. Of necessity, UKH has admitted that FAP is an entitlement:

> Q   Would you agree that the basic eligibility requirements for FAP are that you meet the qualification requirements that we saw on page 48 here, and that your household income level needs to be at a certain level relative to the [federal poverty level]?
>
>    A   Yes.
>
> Q   So an uninsured patient who meets those requirements and submits all of the required proof of their income, residency, et cetera, is entitled to receive financial assistance, correct?
>
>       A       [Objection]
>
>    A   Yes, if it's a -- if it's a procedure that's not exempt from the policy. (Thies FAP 30(b)(6) 84:7-19; *see also id.* 86:7-17 (underinsured patients)).

If UKH approves a patient for financial assistance, the financial assistance will apply to all of the patient's active accounts and any qualifying UK medical bills that the patient may incur over the next six months (*id*. 141:21-142:15).

## 2.   UKH Violated Due Process Because It Did Not Offer Patients a Hearing at the Time FAP Was Denied

UKH denied financial assistance in one of two ways: UKH could send the patient an actual denial letter, or it could simply send the debt to CKMS, which by the terms of the program *automatically* terminated the right to financial assistance.[18] In neither event did UKH offer the patient a hearing at the time of denial, and it therefore violated due process.

---

[18] Patients who receive care from UKH have a right to apply for financial assistance until UK refers the patient's account to a third party for collections, and UKH considers CKMS to be a third-party debt collector for purposes of UKH's financial assistance policy (SoF ¶¶ 119-120), so once UKH refers a patient's account to CKMS, the patient is no longer eligible to apply for financial assistance on that account. (Thies FAP 30(b)(6) 35:5-9)

Until at least August 2020, the FAP application form stated in small print on the last page of the application that the patient "may request a fair hearing regarding denial of financial assistance (DSH) within 30 days of determination" The only reference to a right to a hearing on the denial of financial assistance is on the financial assistance application form. (SoF ¶¶ 124-125).[19]

At the time UKH denied a patient's financial assistance application, UKH did not notify the patient that they had a right to a hearing to appeal the denial (SoF ¶ 127) Nor was there a UKH policy available to patients that informs them of their right to appeal a denial (Thies FAP 30(b)(6) 23:21-24, 24:11-19). UKH's FAP denial letters made no mention of rights to appeal or a hearing even though the FAP program was run on an integrated basis with the DSH program (SoF ¶ 131), and there is a state-mandated denial form for the DSH program (DSH-001) that gives the patient separate, clear, and explicit instructions on how to appeal (SoF ¶ 133). Here, too, UKH chose simply to ignore a state-law requirement relating to notice.

The most common reasons for UKH's denials of financial assistance were that the patient did not supply sufficient proof of household income, did not submit a Medicaid determination letter, or submitted an insufficient letter (SoF ¶¶ 144-145).[20] Each of these situations is one in which UKH and its patient could easily have different views as to whether the patient was wrongfully denied financial assistance and why—questions that are plainly appropriate for resolution by a hearing. In spite of this, UKH has never told the patients to whom it denied financial assistance that they had the right to appeal that eligibility determination. No patient ever requested such a hearing, and UKH never held one (SoF ¶135).

---

None of the medical bills that UKH sent to the patient disclosed that the patient would lose the right to apply for and receive financial assistance once UKH referred the patient's account to a third-party debt collector. (SoF ¶ 123). UKH did occasionally allow patients to apply for financial assistance after it had referred the debt to a third-party debt collector, but only at UKH's exclusive discretion. (Thies FAP 30(b)(6) 35:10-36:18, 38:1-19).

[19] However, the most recent iteration of the FAP application, revised in August 2021, makes *no* reference whatsoever to the patient's right to a hearing of any kind (SoF ¶ 126).

[20] In some instances, UKH would unilaterally decide that an income-qualifying patient's medical services do not qualify for financial assistance before the patient even has a chance to apply (SoF ¶¶ 137-143).

UKH's failure to provide due process to patients who apply for financial assistance could mean wrongful denial of a benefit worth thousands, sometimes tens or hundreds of thousands, of dollars. For some patients, qualifying for financial assistance might be the only thing standing between them and financial ruin.

### III. LETTER 8 WAS NOT DELIVERED IN A "MEANINGFUL MANNER" AND THUS DID NOT SATISFY DUE PROCESS

Letter 8 was not the first dunning letter a patient is sent by UKH's debt collector, CKMS. It was not, in general, either the second or third. On average, a patient would have been sent *five* previous letters from CKMS before being sent a Letter 8 (SoF ¶ 59). Some were sent many more—Plaintiff Metts, for example, was sent *more than 30 letters* before being sent Letter 8 (*id*; Ex. 27). All of these letters were sent in the same plain, white envelope. All of them were at serious risk of being discarded as junk mail, without ever being opened, let alone read. Under the undisputed expert testimony in this matter, Letter 8 was not delivered in a "meaningful manner" and thus did not satisfy due process.

#### A. Letter 8 Was Unlikely to Be Opened, Unlikely to Be Read if Opened, and Unlikely to Be Understood if Read

We live in a world of junk mail. When a document being sent in the mail can affect legal rights, it is important for the sender to take steps to ensure the greatest possible likelihood that the envelope will be opened and the document read and understood. That is the only way to meet the standard set forth in *Mullane*, 339 U.S. at 315 (emphasis added):

> [W]hen notice is a person's due, process which is a mere gesture is not due process. *The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.*

As the Federal Judicial Center has pointed out in the directly analogous context of damages class action notices (highlighting added):[21]

---

### Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

☐ **Are the notices designed to come to the attention of the class?**
The FJC's illustrative notices, as also described in the accompanying "**Plain Language Notice Guide**," explain how to be sure the notices are "noticed" by the casual-reading class member. With "junk mail" on the rise, and the clutter of advertising in publications, legal notices must stand out with design features long-known to communications pros.

○ **Does the outside of the mailing avoid a "junk mail" appearance?**
Notices can be discarded unopened by class members who think the notices are junk mail. A good notice starts with the envelope design, examples of which are at www.fjc.gov.

○ **Do the notices stand out as important, relevant, and reader-friendly?**
It is important to capture attention with a prominent headline (like a newspaper article does). This signals who should read the notice and why it is important. The overall layout of the notice will dictate whether busy class members will take time to read the notice and learn of their rights.

---

Available at https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (the "Bench Guide").

Here, Letter 8 came at the *end* of a long sequence of dunning letters, and it (or, since 2018, also Letter 83, which came one letter earlier) was the *only* mention of a right to hearing a patient/debtor receives. Under the undisputed expert testimony in this action, however, if one actually wants to communicate important information, one puts it in the *first* letter. (Ex. 29 at 5, 7. 14). And DoR concurs: its regulation on what "agencies" such as UKH must do in order to make their debts eligible for forced collections includes a requirement that the agency's *initial invoice* contain "instructions regarding the appeal process." 103 K.A.R. 1:070 § 2(3)(b)(4).[22] UKH *never* complied with that requirement, notwithstanding being formally told by Defendant Watts, that it must. Ms.

---

[21]  In a class action for money damages under Fed.R.Civ.P. 23(b)(3), notice and an opportunity to opt out are required as a matter of due process, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985), so discussions of adequacy of notice in that context are directly relevant here.

[22]  The language of the regulation does not refer to "initial invoice" but rather to an invoice that must be mailed within five working days after the debt becomes due (which plainly *is* the "initial invoice" for that debt), 103 K.A.R. 1:070 § 2(2), and a later subsection makes it clear that § 2(3)(b)(4) is in fact referring to the agency's "original invoice," *see* § 2(7). Defendant Watts's November 24, 2015 letter to UKH (and other agencies), discussed in text, expressly refers to the requirement as pertaining to the agency's "initial invoice."

Watts told UKH what a person "desirous of actually informing" its patients about appeal rights would do, and UKH affirmatively chose not to do it.[23]

Returning to the content and manner of delivery of Letter 8, and as set forth in Plaintiffs' expert's report:

- Letter 8 came in the same plain, white envelope in which CKMS's previous missives had come (Ex. 29 at 4-7), without any "teaser" language on the outside of the envelope informing the recipient that information that could affect their legal rights lurks inside (*id.* at 6-7). A recipient would be unlikely to believe that there was anything new or important in the letter and could just throw it away.

- Letter 8 is printed in tiny (9 point) type (SoF ¶ 33; Ex. 29 at 10-11), which is 3 full points below the recommended 12-point minimum for comprehension;[24]

- Letter 8 does not contain "trust-building" material (such as the blue $^U$K logo) that would persuade recipients it is not a scam (Ex. 29 at 8-10); and

- the hearing language is not only in the generally unread "dead zone" in the middle of the letter (*id.* at 13) but is in fact sandwiched between separate provisions at the beginning and end of the letter that both make it clear that the purpose of the letter is *debt collection*:

  - Thus, the letter opens with, "You have been given every opportunity to pay your account or contact this office to make other arrangements," which UK's 30(b)(6) witness agreed was debt collection language (Deaton 30(b)(6) 78:23-79:2); and

  - The letter ends with, "This communication is from a debt collector, and this is an attempt to collect a debt, and any information obtained will be used for that purpose"—a provision that, UKH's witness agreed, states "the purpose of the notification." (Deaton 30(b)(6) 23:1-13)[25]

---

[23] At her deposition Ms. Watts was "surprised" to learn of UKH's noncompliance (Watts 130:13-131:1), but perhaps she should not have been. It is typical behavior of UKH and DoR that DoR's Stephen Crawford had told UKH's Marcy Deaton that "This isn't really for you. You guys are okay. It's for our other partners." (Deaton 30(b)(6) 107:18-23). Ms. Watts testified that Mr. Crawford had no business saying such a thing (Watts 131:13-132:14). Her November 2015 letter applied to all of DoR's agency partners, including UKH (Watts 130:8-12).

[24] Once upon a time (before 2012), a version of Letter 8 was captioned "NOTIFICATION" in 12-point bold solid caps, but UKH quickly put an end to that (SoF ¶ 33).

[25] The closing language also reinforces the lack of "trust-building" language in the letter (Deaton 30(b)(6) 86:4-10):

    Q    And one of the things you're doing in the hearing -- in the hearing notice in paragraphs 1 through 5 is asking people for information, correct?

        A    Correct.

    Q    So you're telling them that that information will be used for debt collection purposes, correct?

        A    Correct.

Putting all this together, Plaintiffs' direct mail expert, Nicholas Ellinger, concluded that it is "un-likely that [Letter 8] would be opened; if opened, unlikely the 'hearing' section would be read; and if read, unlikely the 'hearing' section would be comprehended" (Ex. 29 at 1). Mr. Ellinger sum-marized his findings as follows:

> The techniques that one would use to get letter recipients to open, read, and under-stand their hearing rights include:
>
> - Putting appeal information in the first letter, which is the most likely to be read. That way, several letters worth of people won't have stopped reading or opening letters before they knew they had this option.
>
> - Putting appeal information in every letter.
>
> - Using different outer envelope/teaser techniques to get follow-up letters opened and read.
>
> - Building trust with the letter recipient, especially vital when asking for money and medical information.
>
> - Using a font size accessible by all, or even most, members of society for the appeal language.
>
> - Highlighting the ability to appeal in a letter opening, P.S., or emphasized font instead of putting it in a reading Dead Zone.
>
> CKMS used none of these techniques. (*Id*. at 14)

As the Federal Judicial Center pointed out in the Bench Guide excerpted above, "[w]ith 'junk mail' on the rise, . . . legal notices must stand out with design features long known to com-munications pros." One such "design feature" is a "teaser" (or, as the FJC says, a "call-out")—a message on the *outside* of the envelope that persuades the recipient to open the envelope and read the material inside. The FJC says, "'Call-outs' on the front and back encourage the recipient to open and read the notice when it arrives with other mail" (Bench Guide at 10). The envelope the FJC suggest for securities class action notices[26] has two teasers, front and back, as follows:

---

So to the extent patients actually opened the envelope and read the part of Letter 8 that offers a hearing, they would learn that although they may be entitled to a hearing, the information they provide if they ask for one would be used by UKH to continue to chase them for collection.

[26]   Available at https://www.fjc.gov/sites/default/files/2015/ClaAct03.pdf.

*Front*

```
Notice Administrator for U.S. District Court
P.O. Box 00000
City, ST 00000-0000


Notice to those who bought XYZ Corp. Stock in 1999.
_____

                    Jane Q. Class Member
                    123 Anywhere Street
                    Anytown, ST 12345-1234
```

*Back*

**If you bought XYZ Corp. stock in 1999,
you could get a payment from a class action settlement.**

It was not that UKH *could not* have put an effective teaser or call-out on the envelopes containing Letter 8. UKH has *admitted* that it could, without violating any provision of the Fair Debt Collection Practices Act and without violating any other provision of law, send notices of hearing rights to persons asserted to owe medical debt to UKH in an envelope:

- with the UK logo and return address in the upper left corner, and
- with a conspicuous message on the exterior of the envelope stating "**IMPORTANT LEGAL NOTICE. YOUR LEGAL RIGHTS MAY BE AFFECTED.**" (SoF ¶ 68)

Once again, UKH simply chose a path that resulted in less notice, less effectively, to fewer people.

The difference between how UKH sent Letter 8 and how DoR sent its notice and seizure letters is stark. Letter 8 was sent in a plain, white envelope and looked like every other letter

received from the debt collector; as discussed, many people do not open such letters. The DoR letters, in contrast, were sent **certified mail**, and pretty much everyone is going to open a certified letter, particularly if the return address is a government agency. It is no surprise, therefore, that at least 500 people did not respond to Letter 8 but contacted DoR with a dispute promptly on receipt of DoR's certified letter (SoF ¶ 67). DoR's letters *were* sent in a manner that would be used by someone "desirous" of having the communication received and read, and *its* letters *were* opened and read. Unfortunately, by the time an account was at DoR, it was too late: no hearings; just collection. Since hearings, in Defendants' view, could happen only at the UKH level, it was **UKH** that was required to send a notice that was designed to be opened, read, and understood. And it never did.

More than 63,000 Letter 8s since 2012; only 65 hearing requests; only 17 hearings—and **only one hearing since January 1, 2017**. The numbers speak for themselves. The manner in which Letter 8 was delivered was constitutionally insufficient.

### B.    *Letter 83 Did Not Solve the Notice Problem*

As set forth above, beginning in 2018 UKH added hearing language to Letter 83, the "we haven't heard from you" letter that went out immediately prior to Letter 8.[27] Like Letter 8, Letter 83 did not tell people that the proffered hearing was their one and only chance to avoid forced collection; indeed, it did not mention DoR at all. Like Letter 8, Letter 83 contained the improper disclaimer of hearing rights for care issues or inability to pay. Accordingly, Letter 83 did not solve the substantive notice problems of Letter 8 addressed in Points I and II above.

And although the manner of delivery of Letter 83 was somewhat better than that of Letter 8—it was in 12-point type, not 9-point, and it arrived one letter earlier in the process—it was

---

[27] Because Letter 83 did not contain hearing language prior to 2018, it does not affect the claims of any Class Member who was referred to DoR prior to then.

still not nearly good enough. It still arrived in the same plain, white, no-teaser envelope that all of

CKMS's mail did, and the hearing language was still bracketed by announcements that the purpose

of the letter was debt collection.  Mr. Ellinger reviewed Letter 83 and concluded (Ex. 30) that "the

letter is still less likely to be opened than it could be" and that "[o]ther than font size, the challenges

in getting the letter read also are consistent with those identified in my earlier report," so that,

"except for font size, my original analysis still holds".

**IV.   THAT SOME PLAINTIFFS AND CLASS MEMBERS ENTERED INTO PAYMENT PLANS WITH DOR DID NOT VITIATE THE DUE PROCESS VIOLATION**

After their accounts were sent off to DoR and they were told that they had no right to

contest their asserted medical debt, some patient-debtors, including some Plaintiffs, entered into

payment plans with the Department of Revenue. It was, they were told, the only way to avoid

seizure of assets.

Defendants have asserted that entry into a payment plan constituted a waiver and that the

"voluntary" payment plan negated any deprivation of property. Neither argument holds water.

**A.   *Entry Into a Payment Plan Did Not Waive The Right to Notice and a Hearing***

State actors have been arguing that debtors facing asset seizure have contractually waived

the right to pre-seizure notice and a hearing for a long time. Courts have rejected those arguments

for just as long—at least as far back as *Fuentes* itself. In *Fuentes*, the creditors claiming the right

to repossess debtors' property pointed to the underlying conditional sales agreement as a basis for

asserting that the debtors had "waived their basic procedural due process rights." 407 U.S. at 94.

In rejecting that argument, the Supreme Court noted that (as is plainly also true here) "[t]here was

no bargaining over contractual terms between the parties who, in any event, were far from equal

in bargaining power." *Id*. at 95. It then went on to hold that "a waiver of constitutional rights in

any context must, at the very least, be clear," *id*. (emphasis in original), and it held that "[w]e need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver," *id*.

The same is true here. There was simply no language in DoR's form payment plan that could be construed as a waiver of constitutional rights. There *is* a waiver in the form, but it is a waiver of laches and the statute of limitations, not of procedural due process protections. (SoF ¶ 107) Accordingly, entry into payment plans with DoR by some Plaintiffs and some members of the Class did not waive their due process rights or their claims that Defendants violated those rights.

### B.   *Plaintiffs' and Class Members' Entry Into Payment Plans Was Inherently Involuntary and Coerced*

*Fuentes* further held that a waiver must be "'voluntarily, intelligently, and knowingly' made," 407 U.S. at 95 (quoting *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 187 (1972)). So, too, Defendants' argument here that there has been no taking of property depends on the asserted "voluntary" nature of the payment plan. But entry into payment plans by Plaintiffs and Class Members was *not* voluntary; it was coerced. It was inherently ***involuntary***.

As noted above, the first communication debtors got from DoR was a notice that their assets are subject to seizure if they do not immediately pay the asserted debt in full. The letter did not mention payment plans, but when patients called DoR they were told that was their only way to avoid either paying in full immediately or having their assets seized (SoF ¶¶ 96-100). The initial letter was followed up by a "Final Notice Before Seizure" (*e.g.*, Ex. 36), which said basically the same thing, only in solid capital letters. Defendant Watts's conclusory assertion that "We don't twist their arm" (Watts 52:1-12) is belied by the content of DoR's own letters.

-40-

And the coercion described above—not only as to Plaintiffs Alexander and Moody but as was *inherent* in DoR's letters and procedures—played out in the face of what Plaintiffs and the Class have shown above were ongoing violations of their rights to due process of law. It is not new law that an agreement obtained by the government through threats that the relevant government officials had no right to make is no agreement at all. *United States v. Tingey*, 30 U.S. 115, 129–30 (1831). Choices made by the party facing the government in such circumstances are not "voluntary" and do not defeat the claim against the governmental conduct. *Waskul v. Washtenaw Cty. Comm. Mental Health*, 979 F.3d 426, 451-52 (6th Cir. 2020). The issue is whether the party opposing the government has a "reasonable alternative," to acquiescing, *see Restatement (Second) of Contracts* § 175(1) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."), and the alternative of refusing to comply and then suing is not in general a "reasonable" one where, as here, "the threat involves . . . seizure of property," *id*. cmt. b. That is all the more true here, because **the government officials themselves told UKH's patients that they had no remedy and they had no choice**. DoR's conduct here was inherently coercive and vitiated consent as a matter of law.

And there *was* a taking of property, both because the payments were not voluntary (and thus were "deprivations") and because of the omnipresent threat that if there was ever a default, the debtor would go back on forced collections—*without* any opportunity to contest the underlying debt. That threat was not chimerical; it was very, very real. From 2016 to 2019, an average of 3,100 debtors *a year* went from payment plans back to forced collections (SoF ¶¶ 175-182). This is a *per se* violation of *Fuentes v. Shevin*. Even if it was unlikely that the patient-debtor had defenses to payment, *Fuentes* teaches that *a hearing must still be offered before assets are seized*.

407 U.S. 87 ("The right to be heard does not depend on an advance showing that one will surely prevail at the hearing.").[28]

## V.    THE APPROPRIATE RELIEF

Plaintiffs and the Class seek declaratory and injunctive relief from this Court. Thus, "the precise remedy is left to the discretion of the trial court acting under traditional equitable principles." *E.g., Alexander v. Machinists & Aerospace Workers*, 565 F.2d 1364, 1382 n.4 (6th Cir. 1977). "[F]ederal-court decrees must directly address and relate to the constitutional violation itself," but the Court may appropriately enter a remedy for a constitutional violation that "is tailored to cure the 'condition that offends the Constitution.'" *Milliken v. Bradley*, 433 U.S. 267, 281–82 (1977).

### A.    *Plaintiffs and the Class Are Entitled to Declaratory Relief that "Eradicates" the Ongoing Effects of Defendants' Due Process Violations*

Here, although Defendants have ceased their active due process violations, the consequences of those violations are still being felt—or, more precisely, *will* be felt if UKH ever determines to sue Plaintiffs and/or Class Members on the debt it still says they owe. In these circumstances it is settled law that Plaintiffs and the Class are entitled to relief, because the consequences of the constitutional violations have not been "completely and irrevocably eradicated." *Cleveland Branch, N.A.A.C.P v. City of Parma*, 263 F.3d 513, 532-33 (6th Cir. 2001) (effects not eradicated); *accord, e.g.*, *Olu-Cole v. E.L. Haynes Public Charter School*, 930 F.3d 519, 531 (D.C.Cir. 2019) (plaintiff entitled to seek relief from "distinct and concrete consequences that continue to run from" expulsion from school, notwithstanding claim of mootness by readmission); *Norman-Bloodsaw v.*

---

[28]    In the Original MSJ, Plaintiffs and the Class also argued that hearings at this stage were required under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1973) (ECF#92-3, PageID1671-77). Because the claims against DoR are now moot, that argument is omitted here. For purposes of the structural relief sought on this motion, it is enough that that *per se Fuentes* violation reinforces the original involuntary nature of the entry into the payment plan and, thus, the ongoing effects of the overall due process violations.

*Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1275 (9th Cir. 1998);[29] *Connell v. Shoemaker*, 555 F.2d 483, 486-87 (5th Cir. 1977) (declaratory relief available as to "practical consequences" of denial of due process, notwithstanding that injunctive claim was moot); *Adams v. Duncan*, 179 F. Supp.3d 632, 644-46 (S.D.W.Va. 2016) (relief available in ongoing dispute as to whether amount of refund was calculated correctly when loan was cancelled); *Center for Food Safety v. Salazar*, 900 F.Supp.2d 1, 5-7 (D.D.C. 2012) (relief available to ameliorate "ongoing effects" of discon-tinued practice); *Chavez v. Northwest Collectors, Inc.*, 1985 WL 3085, at *2 (N.D.Ill. Oct. 11, 1985) (debt collection case; "[i]njunctive relief may be necessary to remedy the lingering, ancillary effect of defendant's [unlawful] practices")

There are three specific ongoing effects of the due process violations from which Plaintiffs and the Class seek relief:

1. ***The balance allegedly due is inflated by the allocation of 20% of all prior pay-ments to the DoR "fee."*** Plaintiffs and the Class were deprived of full credit for the amounts they paid. As set forth above, Plaintiff Alexander paid a total of $20,191.45 to DoR, but the principal amount of her debt was only reduced by $16,153.16. Each of the members of the Class who made payments to DoR (whether under payment plans, garnishments, or levies) suffered a parallel loss.

But because of the due process violations, Plaintiffs and the members of the Class were *never* appropriately subject to DoR's collection methods—including the 25% fee. Further, because no version of Letter 8 disclosed that a fee would be imposed on referral, there was a separate violation of *Hamby v. Neel* specifically with respect to the fee. For both these reasons, DoR's

---

[29]   In *Norman-Bloodsaw*, the Court held:
  "Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing "effect" of the allegedly unconstitutional and discriminatory testing, and expunge-ment of the test results would be an appropriate remedy for the alleged violation." (Emphasis in orig-inal)

allocation of 20% of each payment to the "fee," instead of applying the full amount of each payment to the principal amount of the alleged debt, cannot stand going forward.

> (a) Plaintiff Alexander is entitled to a declaratory judgment that, if UKH sues her for the alleged remaining balance, it must give her full credit for all amounts paid to DoR.
>
> (b) The remaining Named Plaintiffs, and the Class, are entitled to a similar declaratory judgment.

**2.   *The coerced recital in the DoR payment plans that "By executing the payment agreement you have acknowledged that the debts are due and owing."*** Because the payment plans were coerced, this acknowledgment cannot have any effect on any future collection efforts. Plaintiffs and the Class are entitled to a declaratory judgment so stating, lest UKH attempt to leverage its past due process violations into future evidentiary benefit if it sues on the alleged debts.

**3.   *Wrongful denials of financial assistance*.**  For two reasons, Class Members who were wrongfully denied financial assistance (as Plaintiffs Roach, Baughman, and Moody were) are entitled to be told that they may raise that wrongful denial as a defense if UKH sues them on their alleged debt. First, UKH never afforded them the constitutionally required opportunity to contest the denial of that entitlement and, second, from 2018 forward UKH misleadingly told them that "inability to pay" was not a basis for contesting the debt, even if that inability derived from a wrongful denial of financial assistance. Accordingly, Plaintiffs and the Class are entitled to a declaration that they may defend any collection action on the basis of a wrongful denial of financial assistance.

**B.   *The Declaratory Relief Requested is Entirely Prospective and Thus Permissible Under the Eleventh Amendment***

Plaintiffs and the Class hereby incorporate by reference Point II of their opposition to UKH's Motion to Dismiss.

-44-

**C.**      ***Ancillary to the Declaratory Relief, Plaintiffs and the
             Class are Entitled to an Injunction Preventing UKH
             from Taking Unfair Advantage of Them in Any Future
             Collection Action***

Ancillary to these three forms of declaratory relief, Plaintiffs and the Class are entitled to

an injunction to ensure that this Court's declarations do not become nugatory. It has been a regret-

tably common practice for creditors pursuing unsophisticated debtors to ignore the debtors' actual

or potential defenses and simply sue on the debt. Statute of limitations? No problem; it's an af-

firmative defense, waived unless asserted. Ditto discharge in bankruptcy. Ditto settlement and re-

lease.[30] To prevent this and similar behavior, the Court should enter an injunction requiring that,

as a prerequisite to initiating suit on the alleged debt, UKH provide the alleged debtor with a sim-

ple, plain-language notice of the rights declared by this Court. In *Women Prisoners of D.C. Dep't*

*of Corr. v. D.C.*, 877 F.Supp. 634, 682 (D.D.C. 1994), for example, after holding that corrections

officials violated their duty to provide obstetric and gynecological care to incarcerated women, the

court went on to require that "the Defendants shall inform all women prisoners of the procedure

to access health services while incarcerated." Notice relief that is ancillary to relief already being

granted is fully permissible[31] and, here, makes good common sense.

Likewise, the Court should recognize that the passage of time will have made UKH's suits

on the alleged debt far more difficult to defend. Memories fade; documents get lost. Because Class

Members never knew they had a right to a hearing, they were never in a position to protect them-

selves while they still had their paper and still remembered what had happened. The circumstances

here are similar to those in *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786 (6th Cir. 2018), which was

---

[30]   *See generally Midland Funding, LLC v. Johnson*, 137 S.Ct. 1407, 1417-18 (2017) (Sotomayor, J. dissenting).
       Although CKMS, as a "debt collector" within the meaning of the FDCPA, would be prohibited from engaging in
       such conduct, *see, e.g.*, 12 C.F.R. § 1006.26, UKH is the original creditor and thus is not subject to those provisions
       of the FDCPA, *see, e.g.*, *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003).

[31]   *Compare Quern v. Jordan*, 440 U.S. 332, 349 (1979) (granting notice relief that was "ancillary to the prospective
       relief already ordered by the court") *with Green v. Mansour*, 474 U.S. 64, 70-71 (1986) (notice relief not proper
       where not ancillary to other relief).

part of the fallout from Eric Conn's conspiracy to defraud the Social Security Administration. The SSA dithered in holding redetermination hearings, and the Court concluded that Plaintiffs were "likely right" that "the SSA's failure to act immediately caused them significant harm," including "[making] it harder for plaintiffs to supplement their administrative records with additional relevant materials and enabl[ing] Conn to destroy records." *Id.* at 812. The Court further concluded that "[t]hese harms may have had a 'substantial influence' on plaintiffs' ability to establish their initial eligibility for benefits long after the initial determination hearings." *Id.* The remedy, the Court held, was to provide "greater procedural protections" in any redetermination hearings that were held. *Id.* at 813.

So too here. The Court cannot turn back the clock to when Plaintiffs and the Class Members should have had the opportunity to contest their alleged debt, but it *can* ameliorate some of the effects of the passage of time by ordering UKH to provide each Class Member it chooses to sue with a full and complete set of UKH's own records regarding that Class Member. Incomplete as such relief may be, it will give the Class Member at least *some* chance of defending UKH's suit properly.

### VI.   RELIEF IS APPROPRIATE AGAINST UKH AND KMSF

#### A.   *UKH Is Liable for Causing the Deprivation of Class Members' Property Without Due Process.*

In its motion for summary judgment (ECF#88), UKH cited *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), for the proposition that there is no vicarious liability in suits under 42 U.S.C. § 1983, so that—it said—"whether the DOR's collection action violated the Constitution is irrelevant to whether the *University's* act of referring an account pursuant to statutory authority to do so constitutes a deprivation of property" (ECF#88 PageID#1312). The proposition of law is unremarkable, but the conclusion UKH tried to draw was simply wrong.

UKH's liability is not vicarious but direct. Section 1983 imposes liability on one who "subjects, or causes to be subjected" another person to a deprivation of constitutional rights, and it is settled law that:

> Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable.

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007), *cert. denied*, 555 U.S. 813 (2008); *accord, e.g.*, *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012); *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (*en banc*) (liability attaches to "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury"); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560–61 (1st Cir. 1989) (same). As the Sixth Circuit said in *Zamiara*, a defendant "may therefore be liable under § 1983 for the natural consequences of his actions, . . . [which] includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else." 680 F.3d at 695 (internal quotations and citations omitted).

As set forth in *Powers*, the test for causation is whether the third party's actions "were foreseeable." 501 F.3d at 609; *accord, e.g.*, *Garza v. Lansing School Dist.*, 972 F.3d 853, 868 (6th Cir. 2020). Here, of course, DoR's deprivations of the property of Plaintiffs and the Class Members were not merely "foreseeable" when UKH referred accounts to DoR; the deprivations were the known, intended, and contracted-for results of the referrals.[32] As DoR itself has asserted, "both

---

[32] That collection by garnishment, levy, and tax refund offset was known, intended, and contracted-for is perhaps too obvious to require evidentiary support, but the first DOR/UKH agreement, in 2006, expressly referred to DOR's using the "procedures . . . to collect delinquent state and local taxes" instead of CKMS's "ordinary collection procedures" (ECF#95-43, preamble and ¶ 1), and Defendant Watts gave UKH an example of a "warning letter" to be issued for such collections that expressly referred to seizure of real and personal property, bank levies, and wage garnishments (Ex. 148 (ECF#108-20)). Watts's November 2015 letter to UKH likewise included language to be included in UKH's "initial invoices" warning that delinquent accounts "will be turned over to the commonwealth of Kentucky, Department of Revenue for collections," which "may result in wage garnishments, bank levies, tax refund seizures or other collection actions" (ECF#95-8, p.3). The last agreement between UKH and DOR (Ex. 130 (ECF#108-2) at DOR 00386) expressly refers to garnishment and tax refund offsets. *See also* Ex. 149

UK and the Department are state agencies ***acting together*** to collect on medical debts owed to UK Healthcare . . . ." (ECF#94 PageID#1700; emphasis added).

There is, moreover, overwhelming evidence that the Defendants' joint conduct did not cease once UKH referred a debt to DOR for collection. This was far from "one and done"; UKH was intimately involved, on a daily basis, in DOR's collection activities. Among other things:

- UKH and DoR met regularly to discuss ongoing collections issues and procedures.[33]

- Senior officials at UKH developed a detailed "work process for the DOR liaison" on collections issues.[34]

- UKH (generally through CKMS) retains—and has used on hundreds of occasions (ECF#95 ¶¶ 183-200)—authority to instruct DoR to void UKH accounts at DoR.[35]

- UKH retained and used the authority to instruct DoR to adjust a patient's balance.[36] ***Only*** UKH had the authority to adjust for hardship; DoR did not. (Watts 89:9-17).

- UKH retained and used the authority to direct application of payments to specific accounts. In one instance (Ex. 140 (ECF#108-12)), CKMS's Larry Willoughby directed a void, to which DoR's Jeffrey Thompson responded:

  > Voided bill. There is another bill on the case that we can move the payments over to. Would you like DOR to do that or issue the refund?

  Willoughby replied (emphasis added):

  > **You know I guess we had better try and keep the money so yes if you can transfer it then please do so.** Please just let us know what account you are transferring it from, the amount and what account you are transferring it to so that our totals can match.

- UKH retained and used the authority to settle cases.[37]

UKH instigated, participated in, and benefited from the entire DoR collection regime, every aspect of which was infected by the initial lack of due process. Accordingly, UKH is liable for its

---

(ECF#108-21) at UK_0006919 ("Keep in mind that our collection process does involve enforced collections. If there is a case that you don't want us to levy you should consider voiding that case.")

[33] *E.g.*, Ex. 131; Ex. 132; Ex. 147 (ECF##108-3, -4, -19).

[34] Ex. 133 (ECF#108-5).

[35] *E.g.*, Davidson Complaint Tracker 30(b)(6) (ECF#101-23) 46:4-48:1-2; Exs. 134-139 (ECF##108-6 to -11).

[36] *E.g.*, Exs.141, 142 (ECF##108-13, -14).

[37] *E.g.*, Exs. 143-145 (ECF##108-15 to -17)

own conduct in "caus[ing]" Plaintiffs and the Class "to be subjected to" DoR's deprivations of their property without due process of law. And it is therefore likewise properly subject to the declaratory and injunctive relief sought by this motion

### B.    *Relief Is Appropriate as to KMSF Debts*

UKH has recently suggested that relief is not appropriate as to KMSF debts, because (it says) KMSF is not a party to this action. The Class Definition, however, expressly states the KMSF is a "subsidiary" of UKH, and that definition was entered on a litigated motion, on which UKH **never** raised an issue with the characterization. Whatever may or may not be the situation in other circumstances, it is the law of this case that KMSF is under UKH's control (and thus properly subject to relief).

Moreover, *since 1984*, KMSF's debts have been collected *by CKMS* pursuant to a formal written agreement (Ex. 159). This is not a mere agency agreement; the KMSF accounts are actually *assigned* to CKMS, which then proceeds to collect on them (*id.* ¶ 1). While UKH's arrangement with DoR was in place, moreover, KMSF accounts were expressly subject to "reassignment to UK for further reassignment to DOR" (*id.* ¶ 3). And, of course, UKH has not merely admitted but expressly asserted that CKMS is UKH's own "alter ego."[38]

Accordingly, UKH and CKMS are all over the KMSF accounts. Whatever may be the status of *KMSF the entity*, it is indisputable that *KMSF accounts* are under the control of UKH/CKMS and thus are properly subject to relief herein.[39]

---

[38]   Ex. 158 ¶ 25.

[39]   Depending on the position UKH takes, it may be appropriate for the declaratory relief requested herein to be entered in the form of an injunction, so that KMSF the entity will be subject to it as one "in active concert or participation" with UKH and CKMS, *see* Fed.R.Civ.P. 65(d)(2)(C).

## CONCLUSION

The Court should grant summary judgment for Plaintiffs and the Class and enter the declaratory and injunctive described in Point V and set forth in the Proposed Order.

Respectfully submitted,

<table>
<tr>
<td>

s/ _____Ben Carter_____
KENTUCKY EQUAL JUSTICE CENTER
222 South First St., Suite 305
Louisville, KY 40202
(502) 303-4026
ben@kyequaljustice.org

s/ _____David Hymer_____
s/ _____Rachel LaBruyere_____
David Hymer (*pro hac vice*)
Rachel LaBruyere (*pro hac vice*)
BRADLEY ARANT BOULT
CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 521-8000
dhymer@bradley.com
rlabruyere@bradley.com

</td>
<td>

s/ _____Edward P. Krugman_____
s/ _____Claudia Wilner_____
s/ _____Karina Tefft_____
Claudia Wilner (*pro hac vice*)
Edward P. Krugman (*pro hac vice*)
Karina Tefft (*pro hac vice*)
NATIONAL CENTER FOR LAW
    AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org
krugman@nclej.org
tefft@nclej.org

</td>
</tr>
</table>

***Counsel for Plaintiffs and the Class***

December 6, 2022.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of December, 2022, the foregoing was served by filing

in the Court's ECF system, which will deliver true and accurate copies to:

William E. Thro
General Counsel
Shannan Stamper
Deputy General Counsel
University of Kentucky
Office of Legal Counsel
301 Main Building
Lexington, KY 40506
William.thro@uky.edu
Shannan.stamper@uky.edu

R. Campbell Connell
Frank L. Dempsey
Division of Collections; Legal Branch
Department of Revenue
Finance and Administration Cabinet
P. O. Box 5222
Frankfort, KY 40602
rcconnell@ky.gov
frank.dempsey@ky.gov

Kevin G. Henry
Bryan H. Beauman
Donald C. Morgan
Sturgill, Turner, Barker & Moloney
333 W. Vine Street, Suite 1500
Lexington, KY 40507
bbeauman@sturgillturner.com
dmorgan@sturgillturner.com

/s/ Edward P. Krugman
Edward P. Krugman